LAWRENCE C. PHIPPS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88241. Promulgated March 19, 1941.

*David A. Reed, Esq.*, for the petitioner.
*Angus R. Shannon, Esq.*, and *Frank T. Donahoe, Esq.*, for the respondent.

1012

1014

### OPINION.

HARRON: *Issue 1.*—The first question relates to petitioner's gift tax liability for the year 1935. The question is whether or not petitioner is entitled to a specific exemption deduction in 1935 under the provisions of section 505 (a) (1) of the Revenue Act of 1932.[1] Petitioner claims a specific exemption deduction in the amount of $26,150 for the purpose of computing his gift tax liability for the year 1935. Respondent disallowed the claimed deduction because petitioner had been allowed as specific exemption for preceding calendar years three deductions aggregating $50,000. The facts support respondent's de-

---

[1] SEC. 505. DEDUCTIONS.

In computing net gifts for any calendar year there shall be allowed as deductions :

(a) RESIDENTS.—In the case of a citizen or resident—

(1) SPECIFIC EXEMPTION.—An exemption of $50,000, less the aggregate of the amounts claimed and allowed as specific exemption for preceding calendar years.

termination because petitioner was allowed specific exemption deductions in 1932 and 1933 in the respective amounts of $12,000 and $38,000 in the computation of petitioner's gift tax liability for each of those years. Even so, petitioner advances the theory that he is entitled to elect and determine himself the particular years in and over which the statutory exemption of $50,000 is to be claimed and allowed, under the provisions of section 505 (a) (1). In short, petitioner contends that he elected to take a deduction for the specific exemption of only $11,850 for the year 1933; that the Commissioner had no right to increase the exemption deduction to $38,000 in the year 1933, so that petitioner is entitled to a further deduction of $26,150 for the year 1935. Petitioner argues that the doctrine of equitable estoppel applies and estops the Commissioner from disallowing the exemption claimed in 1935.

It is necessary to refer to the proceeding before this Board in Docket No. 78915, reported in *Lawrence C. Phipps*, 34 B. T. A. 641, and to consider the procedure which petitioner has followed heretofore, in the present consideration of the above argument of petitioner. We find no case involving the exact contention which petitioner makes. Petitioner's argument, in our opinion, fails because it would require, if it were sustained, that petitioner receive aggregate specific exemptions in excess of the $50,000 allowed by section 505 (a) (1). Also, if it is at all proper to import into our determination any of the elements of the doctrine of equitable estoppel, we believe that it is petitioner who is now estopped rather than respondent. Petitioner admits that he has paid the deficiency in gift tax for the year 1933 in the amount of $4,108.17 and petitioner has in fact been allowed total specific exemption deductions in the amount of $50,000. *John J. Flynn*, 35 B. T. A. 1064. Petitioner, by his conduct in acquiescing, when his gift tax liability for 1933 was before this Board, in respondent's allowance for an exemption of $38,000 for computing gift tax for 1933, has received the benefits of the statute and has put the Commissioner in a position where "to retrace their steps on a different state of facts would cause the loss of taxes to the Government." *Robinson* v. *Commissioner*, 100 Fed. (2d) 847. It can not be said fairly that the Commissioner has been at fault, that he has been arbitrary, or that he has placed petitioner in a disadvantageous position.

Respondent mailed a notice of deficiency in gift tax liability for 1933 to petitioner on February 28, 1935, which represented his final determination. In computing that deficiency in the amount of $4,108.17 respondent allowed a specific exemption deduction of $38,000. The deficiency resulted from an increase in the total amount of gifts made in the year 1933. It would have been greater in amount if re-

spondent had allowed as a specific exemption deduction only $11,850, the exemption claimed by the petitioner in his gift tax return for 1933. Petitioner filed a petition with this Board on March 27, 1935, in which he contested only the respondent's increase in the amount of taxable gifts made in 1933. Petitioner did not contest respondent's allowance of the specific exemption deduction in the amount of $38,000. If the petitioner had alleged in the petition that he was entitled to a specific exemption for 1933 of only $11,850, respondent could have moved for an increase in the deficiency in gift tax for 1933 at or before the hearing. See section 272 (e) of the Revenue Act of 1932. However, upon the issues presented, the Board determined the total amount of petitioner's gift tax liability for 1933 and found that there was a deficiency in the amount determined by the respondent. Even after the report of the Board was promulgated petitioner did not move to have the proceeding reopened to consider any additional question such as his right to a deduction for the smaller amount for the specific exemption. Under such circumstances it must be held that petitioner acquiesced in respondent's allowance of a specific exemption deduction for the year 1933 in the amount of $38,000. Petitioner now has no equitable ground for claiming that respondent is estopped from disallowing a further specific exemption deduction for the year 1935.

Section 505 (a) (1) contemplates that a taxpayer may elect to spread over several years the $50,000 specific exemption rather than apply it to one year only. However, the statute clearly limits this right of election by limiting the aggregate deductions to those which have been claimed *and allowed* in prior years. In other words, where the aggregate deductions allowed in prior calendar years aggregate $50,000 no further deductions for specific exemption may be claimed or allowed. In *Lunsford Richardson*, 39 B. T. A. 927, the taxpayer believed that he had not made any taxable gifts in the year 1932 and he did not file a gift tax return for that year, his theory being that certain gifts were made prior to the effective date of the gift tax provisions in the Revenue Act of 1932 which became effective June 6, 1932. The respondent determined that the taxpayer was liable for gift tax for the year 1932 and asserted a deficiency. The taxpayer filed a petition with this Board alleging error in that determination, and he also raised the specific issue in the proceeding before the Board with respect to his right to receive in 1932 the specific exemption of $50,000 provided by section 505 (a) (1). The taxpayer raised the issue in his petition as an alternative issue, in the event that the Board should determine that gifts had been made which were subject to gift tax. The taxpayer had filed a gift tax return for the year 1934 in which he had claimed the specific exemption of $50,000 for that year, and the Commissioner urged that he should be held to the election

which he made in filing his 1934 gift tax return. The Board held that the petitioner was entitled to the $50,000 specific exemption in the year 1932 and stated as follows:

It is doubtful whether petitioner made such an "election" in claiming the specific exemption in the year 1934 that it cannot now be claimed in the year 1932. Generally, the doctrine of election applies only where there are two or more remedies, all existing at the time of election, and which are inconsistent with each other. If the remedies are not cumulative the choice of one makes all others unavailable. But we have no such situation here. Our first question is whether or not petitioner is subject to a gift tax for the year 1932. We have held that he is. Then, says petitioner, he is entitled to the $50,000 specific exemption allowed by section 505 (a) (1) of the Revenue Act of 1932. Since the act specifically grants him the exemption, and since, in our opinion, he has not heretofore "elected" to claim it in some other year, we hold that in recomputing the deficiency for 1932 the specific exemption of $50,000 should be allowed.

The *Richardson* case is distinguishable from the present case, but the above reasoning is applicable here. When petitioner received the notice of deficiency in gift tax for the year 1933 and when he filed a petition with this Board to review the Commissioner's determination, he then had a choice either of claiming the full benefit of section 505 (a) (1) or only a part of the benefit with respect to his gift tax for the year 1933. He also had the right either to accept the respondent's determination as to his gift tax liability and pay the deficiency of $4,108.17, or to file a petition with this Board to have his gift tax liability redetermined. Petitioner chose the latter course. That choice, however, did not exclude the possibility of seeking to have less of the specific exemption deduction applied than the $38,000 which respondent had applied in determining the gift tax deficiency. There was nothing inconsistent with petitioner's claiming before the Board that there was no deficiency in gift tax liability and at the same time claiming, in the alternative, that if the main question should be decided against him he should nevertheless be allowed less than $38,000 as an exemption under section 505 (a) (1) in the computation of the gift tax for the year 1933. Petitioner, by acquiescing in respondent's allowance of the exemption of $38,000 for the year 1933 in the proceeding before this Board, modified his original election to deduct only $11,850, the amount claimed in the gift tax return for 1933. Petitioner can not now, with good grace, say that he elected to receive less than the $38,000 which was allowed him for 1933. It is immaterial that petitioner filed a protest with the Commissioner in 1936 against disallowance of a specific exemption deduction for the year 1935. After petitioner had tried his case before this Board with respect to his gift tax liability for 1933 without raising any issue with respect to the amount of the exemption deduction to be allowed for 1933, it was not incumbent upon the Commissioner to change his final determination

of gift tax liability for the year 1933 merely because a claim for a further exemption deduction was made in the gift tax return for 1935, which on its face was not an allowable claim. Also, it is entirely outside the scope of the Board's jurisdiction to give any consideration whatever to any offers in settlement which the petitioner may have made to the Commissioner for gift tax for the year 1933 outside the proceeding before the Board. We have reference to a statement in petitioner's brief that he made an offer to the Commissioner to pay a larger gift tax for 1933 than the amount determined by the Commissioner for that year.

On this issue respondent is sustained. Petitioner has received aggregate specific exemption deductions in the sum of $50,000 for the years 1932 and 1933 and he is not entitled to any further exemption in the year 1935.

*Issue 2.*—Petitioner made gifts to 13 persons on October 15, 1935, of various amounts of stock in 3 corporations, one of which was the Nevada-California Electric Corporation. In the Federal gift tax return for 1935 petitioner reported each group of gifts under the name of each donee, reported the value of each block of stock, and since the value of the several blocks of stock given to each individual aggregated a total value of more than $5,000, petitioner claimed and received aggregate exemptions of $65,000 from gift tax under section 504 (b) of the Revenue Act of 1932. Respondent determined that the value of the shares of Nevada-California Electric preferred stock given to each donee was an amount equal to the number of shares comprising each gift multiplied by the unit value of $51 a share. Petitioner reported the value of the preferred stock given to each donee by multiplying the number of shares in each gift by a value of $50 per unit, which he believed was the market price of the stock in over the counter transactions in Denver on the date of the gifts. Respondent found that there had been a transaction in this stock on the date of gift at a price of $51 a share and he determined that such amount was the value per unit of the stock and increased the value thereof for the purpose of computing the tax. There was a sale of 50 shares of the preferred stock on the New York Curb Exchange on the date of gift at $51 a share. The evidence also shows that there was a sale in Denver on October 15, 1935, of 50 shares for $51.17.

In this issue the only question for determination is the value, for the purpose of computing petitioner's gift tax liability for the year 1935, of the gifts of the Nevada-California Electric Corporation preferred stock at the date of the gifts. The statute provides that "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Sec. 506, Revenue Act of 1932. The parties appear to agree that value, as used in the statute, means "fair market value," and for the purposes of the opinion it is assumed

that the value to be determined is the fair market value on the date of the gifts.

At the outset there appears to be a question as to what property is to be valued. Petitioner contends that the property to be valued is a block of 10,000 shares of stock. Respondent contends that the standard prescribed by section 506 requires that the property to be valued is the property involved in each gift to each of the 13 donees. Respondent contends that the value to be determined as of the date of the gifts is not the value of a block of 10,000 shares of the preferred stock, but the value of the number of shares given to each donee. Petitioner made 13 separate gifts of the preferred stock as follows: 1 gift of 2,500 shares; 2 gifts of 1,250 shares; 4 gifts of 1,000 shares; 2 gifts of 300 shares; and 4 gifts of 100 shares. The aggregate number of shares of the preferred stock given away by petitioner on October 15, 1935, is 10,000 shares, but, obviously, petitioner did not give a block of 10,000 shares to one donee. In this situation respondent submits that petitioner must fail in his contentions in that he has not attempted to show the value of the stock comprising each separate gift on any other basis than on the basis of a gift of a block of 10,000 shares. Respondent contends that petitioner has failed to overcome the presumption of correctness of respondent's determination.

Petitioner contends that the value of 10,000 shares of the preferred stock should be determined by multiplying the 10,000 shares by the unit price of $40 per share. Petitioner concedes that there were sales, on the date of the gifts, of 50 shares of the preferred stock at $51 per share. However, petitioner contends that the fair market value of 10,000 shares is much less per unit than the fair market value per unit of 50 shares. At the hearing counsel for respondent clearly indicated that it was his theory that each gift should be treated separately and that the value of each gift should be determined by considering the number of shares of stock involved in each gift, only. However, petitioner proceeded upon the theory that the value to be proved was the value of a block of 10,000 shares. The question calling for an opinion as to value, directed to each one of petitioner's expert witnesses was: "What, in your opinion, would be the fair market value of a block of 10,000 shares of the preferred stock of the Nevada-California Electric Corporation on October 15, 1935, as between a willing buyer and a willing seller? Please leave out any question of a distress sale or a compulsory purchase." Petitioner did not offer evidence as to the fair market value per unit of a block of 2,500 shares, or 1,250 shares, or 1,000 shares, or 300 shares, or 100 shares. Petitioner contends that, since 10,000 shares were given away on the same day and since the gift tax is assessed against the donor, the value to be determined in this case is the value of the entire block given away by petitioner. Proceeding upon this theory, petitioner's expert witnesses, who were quali-

fied to express opinions as to value, were asked to give their respective opinions of the fair market value of a block of 10,000 shares of the particular preferred stock on the date of the gifts. Of the four opinions expressed, two witnesses expressed the opinion that the value of the block of 10,000 shares was $40 per unit. One witness was of the opinion that the large block had a value computed at a unit price of $41 a share, and one witness was of the opinion that the value of the large block of stock was an amount computed on a unit value of $38 a share. Upon the entire record petitioner asks the Board to determine that the value of a block of 10,000 shares is $400,000 computed at a unit price of not more than $40 per share.

Section 506 states that the value of the property constituting a gift shall be considered the value of the gift. In our opinion the statute requires that first each gift of property is to be valued separately. Then, the separate values are to be taken together in a total amount and the statutory exclusions and specific exemption deduction, allowed by sections 504 and 505, are to be subtracted to arrive at the computation of "net gifts" made in the taxable year. The underlying theory of the gift tax statute appears to be to impose a tax "upon the *transfer* during such taxable year by any individual, * * * *of property by gift.*" Sec. 501. It is the *transfer* of property by gift which is taxed. Therefore, at the outset, petitioner errs in his conception of the question in this case when he states that the question to be determined is the value of a block of 10,000 shares of the preferred stock. While petitioner may validly advance a theory that the value of each lot of stock in blocks of 2,500 shares, 1,250 shares, 1,000 shares, 300 shares, and 100 shares may be affected by the fact that all gifts made on the same day aggregated 10,000 shares, or that the value of each gift of a comparatively small block of shares was less than the value indicated by market price on the date of gift because on the same date 12 other gifts of blocks of the same stock were made, such circumstance does not alter the question to be determined under the pertinent statute. The property to be valued, under section 506, is the property constituting the gift. Here there were 13 gifts. Petitioner's premise and theory have the effect, in our opinion, of asking us to substitute a different property for the property which was in fact the property in each gift. It might be that the value of a block of 10,000 shares is the same as the aggregate of the values of each of the 13 gifts, but the standard adopted in the statute requires that the value of the property given shall be considered the amount of the gift, and we understand this to mean that *each gift* is to be valued.

The problem presented is unusual because the property constituting each gift is the same, stock in the same company. It is important, however, to keep clear the object of the present inquiry, the accurate nature of the question, because petitioner rests his argu-

ment entirely upon the presumption that "blockage" is involved. Respondent argues that petitioner's presumptions are as follows and that they are not sound: That value is to be determined on the basis that 10,000 shares are to be offered for sale; that no one could find a willing buyer for a block of 10,000 shares on the basic date; that on account of 10,000 shares *en bloc* being involved, value is to be determined by what a dealer would pay for it wholesale for resale to the general public at a profit; and that because a block of 10,000 shares is allegedly involved the market price on the basic date is not evidence of value because of a further presumption that an increase in the supply of the stock in such a large quantity would depress the existing market price.

Upon due consideration of all of the evidence, including the opinion evidence of the expert witnesses called by petitioner, it has been found as fact that each gift of the preferred stock had a value of $51 per unit of the property multiplied by the total units involved in each gift.

The evidence relating to fair market value of the preferred stock of the Nevada-California Electric Corporation consists of the annual financial reports of the company for the years 1930 to 1935, inclusive; monthly combined comparative statements of earnings and expenses for the first 8 months of 1935, including the month of August; statement of consolidated net income for 1930 to 1935, inclusive, as shown on Federal income tax returns; dividends and earnings per share of the preferred stock in question and of comparable 7 percent preferred stocks of similar utility companies for the years 1930 to 1935, inclusive; lists of transactions in the preferred stock in question in Denver throughout the year 1935 in which 3 Denver over the counter firms participated; a list of transactions in the particular stock on the New York Curb Exchange for 60 days before and after October 15, 1935, the date of the gifts; a table classifying stockholders of the preferred stock by number of shares held and by residence (respondent's Exhibit H, admitted in evidence); the testimony of petitioner and three expert witnesses called by petitioner; and the testimony of one expert witness called by respondent.

Consideration has been given to all of the evidence, including the testimony of petitioner and petitioner's expert witnesses. The question relating to the value of the stock constituting the gifts is a question of fact. *Heiner* v. *Crosby*, 24 Fed. (2d) 191. The value to be determined is the "fair market value" of the property constituting each gift. "Fair market value" has been defined as the price which would probably be agreed upon by a willing seller and a willing buyer, neither being under any compulsion, and both having reasonable knowledge of the facts. *John J. Newberry*, 39 B. T. A. 1123, 1129. Actual sales of the property to be valued are evidentiary of

fair market value. Under certain facts and circumstances, actual sales made between willing parties are reliable evidence of value. *Cecil H. Gamble, Executor*, 33 B. T. A. 94; affd., 101 Fed. (2d) 565; certiorari denied, 306 U. S. 664; *Estate of Leonard B. McKitterick*, 42 B. T. A. 130, 136; *John J. Newberry, supra*. On the other hand, actual sales, although evidentiary, are not always conclusive, and under certain proven situations and circumstances do not signify fair market value. The existence of exceptional circumstances which deprive actual sales of evidentiary worth will not be presumed but must be proved. Whether or not the fair market value of a block of stock is in reality evidenced by the value of a share of the same stock in a small block or a smaller block in a transaction on the market between willing parties to the sale is always a matter of evidence in each case, and "If the value of a given number of shares is influenced by the size of the block, this is a matter of evidence and not of doctrinaire assumption." *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259, 263; affd., 95 Fed. (2d) 806. In some cases it is a paramount circumstance that the stock to be valued consists of a large block and the valuation of a large number of shares involves consideration of factors different than those applicable to the unit market price resulting from transactions on the market in small lots of the stock. Cf. *Safe Deposit & Trust Co. of Baltimore, Executor, supra*. In other cases the value of a large block of stock has been based upon the market price of small share lots thereof, notwithstanding the testimony of experts that such a market price is not evidence of fair market value. *Cecil H. Gamble, Executor, supra; Roth* v. *Wardell*, 77 Fed. (2d) 124; *Union National Bank of Pittsburgh* v. *Driscoll*, 32 Fed. Supp. 661; *Richardson* v. *Helvering*, 80 Fed. (2d) 548. In each case the question of fact, fair market value, is to be determined upon full consideration of all of the evidence in the case.

The Nevada-California Electric Corporation and its subsidiary companies, prior to the year 1935, had gradually increased gross operating earnings and surplus earned each year, so that at the end of 1934 and 1935 surplus after reserves and after dividends on the 7 percent preferred stock was $2,157,553, and $3,092,139, respectively. Gross operating earnings for every year from 1929 to 1935, inclusive, exceeded $5,000,000 except in 1933, when gross earnings were approximately $4,782,000. In all of these years the Nevada-California Electric Corporation and its subsidiaries realized net operating profits each year in excess of $2,000,000. The parties introduced in evidence as joint exhibits the corporation's annual reports for the years 1930 through 1935, which give a comparative consolidated statement of income and profit and loss which includes the year 1929, so that the evidence includes financial reports covering six years prior to the year 1935, as well as for the year 1935 and for the first 8 months of

1935. A reading of these annual reports leaves a strong impression that the Nevada-California Electric Corporation was exceedingly well managed throughout the entire 7-year period, which included a period of severe economic depression, 1929 through 1933, as well as periods of shortage of water during drought periods. From 1932 through 1934 the total amount of outstanding bonds in the hands of the public was reduced each year. In 1934 the debenture debt was reduced by $1,857,200. It is true that the highest figure for gross earnings was reached in 1929 at $5,674,700 and that gross earnings fell off gradually to $4,782,608 in 1933, increased in 1934 to $5,209,151, but during this period the management practiced various economies, extending the area of its business, gained new business, successfully carried on a "load-building" campaign, and reported to its stockholders each year that it was in a "sound financial position." It maintained "ample cash" reserves and developed a "simplified" financial structure. While 1933 had been a year of lowest earnings since 1925 and dividends on preferred stock had been reduced to $4 a share in that year, the corporation recovered its average position in 1934 and resumed payment of $7 dividends on the preferred stock. The corporation had paid dividends on the 7 percent preferred stock from 1929 through 1934 as follows:

| | | | |
|---|---|---|---|
| 1929 | $703,913 | 1932 | $777,264 |
| 1930 | 777,427 | 1933 | 422,585 |
| 1931 | 787,787 | 1934 | 734,061 |

Petitioner testified that he had always regarded the 7 percent preferred stock in the Nevada-California Electric Corporation as a sound investment.

The Nevada-California Electric Corporation and its subsidiaries carried on business and served agriculture, mining, and various industries in Nevada and California. Its directors reside in Denver and Pasadena. Its general office is in Denver and its operating headquarters are in Riverside, California. Out of 1,163 stockholders, 995 reside in California and Nevada. It is not unnatural that the market for its stock is largely in Denver, and the evidence relating to over the counter transactions is not diminished at all by the fact that they are transactions in Denver.

The parties introduced as a joint exhibit lists of transactions in the year 1935 in Denver, over the counter by three Denver firms, and this evidence, while incomplete as to all transactions in the Denver market during the year 1935, is important. It shows that, as far as it goes, the purchases and sales, as reported by the exhibit, involved a total of 10,946 shares of the preferred stock. One of petitioner's witnesses testified that according to the records of the secretary of the corporation a total of only 6,200 shares of the preferred stock were transferred on the books of the corporation in

1935. The record does not reconcile the apparent discrepancy. However, even on the testimony of this witness there was a large increase in the turnover of the preferred stock in 1935 as compared with 1934, when, according to the witness's information received from the secretary of the corporation 3,300 shares were transferred on the books. According to the corporation's records, as reported by this witness (the records not being offered in evidence) transactions in the preferred stock were almost twice as great in 1935 as in 1934.

The market prices of the preferred stock in Denver in over the counter transactions increased gradually and steadily from January through December of 1935. Industrial conditions were on the upgrade throughout the country in 1935, market prices of securities advanced generally from April to the end of 1935, and they advanced in October of 1935. During the month of October the market prices for the preferred stock in Denver ranged from a low of 46.25 on October 2 to a high of 55.50 on October 29. The purchases and sales reported in Denver during the month of October were for small lots of stock of 5 shares, 10 shares, 25 shares, 30 shares, 50 shares, 88 shares. The transactions as reported for the entire month of October involved an aggregate of 579 shares. The market prices gradually rose during the month. On October 1, 18 shares were bought for $46.50 a share; on October 2, 88 shares were sold for $46.25 a share; on October 4, 88 shares were sold for $46.50 a share; on October 15, 50 shares were bought for $51.17 a share; on October 18, 50 shares were bought for $51 a share; on October 19, 51 shares were sold for $53 a share. Market prices for the preferred stock increased in every month prior to October, as the table in the findings of fact shows. Prices held up under sales of blocks of 100, 500, and 1,000 shares. Thus on September 17, 10 shares sold at 47; on September 20, 100 shares sold at 48; and on October 2, 5 shares sold at 48. In another period, in the month of January, on January 3, 800 shares were bought at 39; on January 26, 550 shares were bought at 39; on February 1, 1,000 shares were sold at 40.50; on February 4, 100 shares were sold at 43. In another period, after October 15, in November, prices gradually increased and purchases and sales of 100 and 200 share lots did not drive the market prices down. For example: November 1, bought 200 shares at 59.50; November 2, sold 100 shares at 59.75; November 6, sold 100 shares at 63.50; November 26, bought 100 shares at 64; November 27, sold 202 shares at 62; November 29, bought 100 shares at 64, sold 100 shares at 66.50. Considering the evidence as to purchases and sales in over the counter transactions in Denver in the months preceding and succeeding October of 1935 we find that the evidence before us shows transactions involving 879 shares of the preferred stock in September, and 1,749 shares in November. In November, on the New York Curb

Exchange, in the week ending November 1 there were 100 shares sold, and in the week ending November 8 there were 100 shares sold. During the month of December of 1935, according to the evidence, purchases and sales of the preferred stock in Denver involved 1,719 shares at prices ranging from 64 to 70, with a gradual rise. There were transactions involving blocks of 100, 150, 250, 500 shares.

The foregoing clearly shows, in our opinion, that there was a fair market for the preferred stock. In our opinion the market price on the date of the gifts is the best evidence of the value per unit of the stock comprising each gift. The evidence does not support a finding that the value of the stock given to each donee in lots of 100, 300, 1,000, 1,250, and 2,500 shares was less than $51 a share.

All of the witnesses for petitioner, including the petitioner, were asked to express an opinion as to the fair market value of a block of 10,000 shares on the basic date. Each was of the opinion that the size of the block would bring the unit value down to a price below the current market price to $38 a share, or $40, or $41 a share. The testimony of petitioner and of his three expert witnesses has been carefully considered in an effort to give to that evidence such weight as it deserves. Their testimony has been considered together with the general evidence relating to the financial condition of the Nevada-California Electric Corporation, its record of earnings, surplus, and dividends, and the evidence relating to the over the counter market in Denver in 1935 in the preferred stock. In our opinion the testimony of the petitioner's witnesses shows that they did not give sufficient consideration to the extent and volume of trading in the stock in the Denver market, and the trends of the market prices during 1935 and during the period shortly before and after the date of the gifts. All of petitioner's witnesses were concerned with the problem of valuing a block of 10,000 shares rather than the property involved in each gift. In our opinion, all of petitioner's witnesses assumed a greater possible shortage of buyers and a more inactive or "thin" market than the general evidence indicates.

Respondent, on brief, points out that petitioner assumes that the value of the gifts in question is to be determined on the basis of the effect on market prices of offering a block of 10,000 shares for sale; and upon the assumption that such an offering would not bring forth buyers at the market price prevailing on the date of the gifts. Or, in the language of respondent:

The objection of the respondent is not to the operative results of the law of supply and demand but to its application here upon an assumption of a nonexistent fact, an unbalancing of the existing supply and demand by the addition of the property to be valued to the existing supply without assuming an equal increase in the demand, and a speculation as to the operative effect of such assumed fact on the market price.

Regardless of how the theory of the petitioner may be camouflaged, it results in the application of the standard of a forced sale. Its adoption would substitute such a standard for the long-established standard of sale prices of similar property in a free and open market where such prices are in evidence or its equivalent, the value based on the assumption of a willing buyer and a willing seller evidenced by the price at which comparable property is being actually bought and sold in a free and open market.

Respondent points out further that petitioner assumes that value is to be determined upon the basis of for what amount a syndicate would purchase such a block for resale at a profit, and that all of petitioner's assumptions lead to the contention that the *standard of value* at law, contemplated in section 506, is a standard which shifts according to the size of a block of stock, where the property involved is stock; that value may be evidenced by market price (that which a willing buyer and a willing seller will agree to), where the block of stock is small, but that another standard of value is to be applied where the block of stock is larger than the blocks involved in actual market transactions making the market price what it is. Respondent submits that the standard of value contemplated by the statute does not admit of classification dependent upon whether or not the size of the block of stock to be valued is the same as the size of the lots or the blocks of stock involved in the actual market transactions giving rise to market price.

We believe petitioner's theory places too much reliance upon that which is conjectural and speculative. The evidence shows that there was a market in Denver for the stock in question and that there was extensive market activity in 1935, and in the month of October, and in the 30-day periods before and after the date of the gifts. The stock in question was widely held by more than 1,000 stockholders. Market prices steadily advanced prior to October, during October, and thereafter to the end of 1935. (Cf. *Helvering* v. *Safe Deposit & Trust Co. of Baltimore, supra,* where market prices steadily declined after the date of the gifts in question in that case). The earnings of the Nevada-California Electric Corporation were increasing. At $51 a share, $7 dividends per year represent a yield of 13.72 percent. There is no evidence that the market in the stock was not a fair market or that market prices were not fair. We believe it is a rather speculative assumption that if any one or all of the donees of the gifts in question looked to the market at the date of the gifts they would not find willing buyers for the stock involved in each gift, or that if buyers appeared they would not be willing to enter into transactions at market prices. It may as well be assumed that the market price would go up rather than go down if offerings of the property involved in each gift had been made on the date of the gift.

The property involved in each gift in this case was property which was regularly purchased and sold in an established market. The

standard of value which at law is to be applied in valuing the property in question is "fair market value." Fair market value is evidenced here by established market price. The market price is not shown to have been a price resulting from transactions between any special classes of "willing sellers" and "willing buyers." There is no evidence, or circumstance, in our opinion, which would require us to determine value on the basis of what a special class of buyers, syndicate managers, would agree to as the value of the stock in question, or to substitute a syndicate wholesale price for market price as the best evidence of value. Cf. *Helvering* v. *Kendrick Coal & Dock Co.*, 72 Fed. (2d) 330, 333; *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 185; *Metropolitan Life Insurance Co.* v. *United States*, 65 Ct. Cls. 149; *United States* v. *New River Collieries Co.*, 262 U. S. 341. On the basis of all the evidence, we think the record supports the respondent's determinations of the value of each gift.

Respondent called one expert witness. His testimony has been considered. He had made a study of market conditions, trends of market prices of comparable 7 percent preferred utility stocks, and other factors. However, in arriving at the conclusion that respondent's determination of value is correct, little weight has been given to the testimony of respondent's witness. His answers to many questions were confusing because of a failure to make clear in the record the distinction between his general theories and his opinion of the fair market value of the particular stock.

Petitioner concedes that respondent's determination of the deficiency in gift tax for the year 1934 is correct. The conclusions reached herein support the deficiency in gift tax for the year 1935.

Reviewed by the Board.

*Decision will be entered for the respondent.*