*Decision will be entered under Rule 50.*

</div>

JOHN J. NEWBERRY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MYRTLE H. NEWBERRY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 85780, 87929, 85779, 87930. Promulgated May 26, 1939.

*Thomas L. Zimmerman, Esq.*, for the petitioners.
*Harold F. Noneman, Esq.*, for the respondent.

1124

OPINION.

Murdock: The Commissioner conceded at the hearing that the petitioners are entitled to an exclusion of $5,000 for each of the twelve gifts involved in these proceedings. The only issue for decision by the Board is the value of each of the twelve gifts on the date that it was made. Each petitioner on each of three dates made two gifts. Each gift was of 2,500 shares of common stock of the J. J. Newberry Co. The Commissioner in determining the deficiencies placed a value on each gift by multiplying by 2,500 the unit price at which shares of the stock were currently selling on the New York Stock Exchange. The petitioners, on their returns, valued the stock at about $5 less than those unit prices. Their contention would seem to be that the value of each block was about $5 per share less than the current unit price shown by the exchange sales and quotations because of the size of the blocks given in each instance, i. e., that blocks of 5,000 shares, and perhaps even blocks of 2,500 shares, if thrown upon the market at the time the gifts were made would have depressed the market more than 5 points, and the most advantageous way in which such blocks could have been sold on the basic dates would have been outside of the market to distributors who would have paid about 5 points under the market to give themselves a profit for handling the transactions. The conclusion would be that the fair market values of such lots as were given on the basic dates were at least 5 points below the prices being obtained on the market for small blocks.

The regulations of the Commissioner expressly reject the theory that a large block of stock has any different value than would be obtained by multiplying the current market price of a single unit or share by the number of units in the block. Regulations 79, art. 19. It has been held that a regulation of this kind is not binding, since it attempts to preclude factors which may have a material bearing on value. *Safe Deposit & Trust Co. of Baltimore*, 35 B. T. A. 259; affd., 95 Fed. (2d) 806; *Commissioner* v. *Shattuck*, 97 Fed. (2d) 790; *Helvering* v. *Kimberly*, 97 Fed. (2d) 433; *Ernest A. Cronin*, 37 B. T. A. 914. Fair market value is primarily a question of fact and all evidence bearing upon it should be considered, including any evidence to in-

dicate that the market value may be affected by the size of the block. *Florence Guggenheim*, 39 B. T. A. 251; *Safe Deposit & Trust Co. of Baltimore, supra.*

The statute provides that in the case of a gift of property, "the value thereof at the date of the gift shall be considered the amount of the gift." Sec. 506, Revenue Act of 1932. The parties have proceeded upon the theory that value, as there used, means "fair market value." See Regulations 79, art. 19. Cf. *Frank J. Kier*, 28 B. T. A. 633; *Waldemar R. Helmholz*, 28 B. T. A. 165; *Mary A. B. duPont Laird*, 29 B. T. A. 196; *Caroline W. Edwards*, 31 B. T. A. 879; *Cecil H. Gamble*, 33 B. T. A. 94; *Eleanor Lansburgh*, 35 B. T. A. 928; Regulations 70, art. 13. We, therefore, assume for the purpose of this opinion, that the value to be determined is the fair market value of each gift on the day it was made.

The term "fair market value" has been considered and defined frequently. The definition may be stated as the price which would probably be agreed upon by a seller willing, but under no compulsion, to sell, and a buyer willing, but under no compulsion, to buy, where both have reasonable knowledge of the facts. *Phillips* v. *United States*, 12 Fed. (2d) 598; *Tracy* v. *Commissioner*, 53 Fed. (2d) 575; *Crowell* v. *Commissioner*, 62 Fed. (2d) 51; *Florence Guggenheim, supra.* Actual sales made under such circumstances are reliable, if not the best, evidence of fair market value. *Doric Apartment Co.* v. *Commissioner*, 94 Fed. (2d) 985; *United States* v. *New River Collieries*, 262 U. S. 341; *Ithaca Trust Co.* v. *United States*, 279 U. S. 151; *Andrews* v. *Commissioner*, 38 Fed. (2d) 55; *Grant Co.* v. *Duggan*, 94 Fed. (2d) 859; *Helvering* v. *Kendrick Coal & Dock Co.*, 72 Fed. (2d) 330, 333; *Commissioner* v. *Robertson*, 75 Fed. (2d) 540; certiorari denied, 293 U. S. 763. However, fair market value may be determined in the absence of actual sales and may even be shown to be different from the price at which actual sales were made. *Crowell* v. *Commissioner, supra; Tracy* v. *Commissioner, supra.*

All parties to these proceedings seem to agree that the prices at which sales were being made on the New York Stock Exchange are the most reliable indication of fair market value on that day. The petitioners accept the New York Stock Exchange prices as conclusive proof of the value on each of the basic dates of small blocks of J. J. Newberry Co. stock. Their sole contention seems to be that those prices would have to be discounted about 5 points in order to arrive at the fair market value of a block of 2,500 or 5,000 shares. The parties have stipulated all of the basic facts and figures which are in the record. The testimony consisted of opinion evidence given by three witnesses called by the petitioner and two called by the respondent.

The three witnesses called by the petitioner were called apparently to testify, and they did testify, that the market for the Newberry stock

was so thin that it would have been seriously depressed by the offer of a block of 2,500 or 5,000 shares, and such a block could have been disposed of to best advantage by a sale outside of the exchange to a dealer who would have paid about 5 points under the market for the shares and then would have sold them privately to customers at the same prices which prevailed upon the exchange. The first witness did not express an opinion as to the extent of the decline in market price which would have resulted from throwing such a block of shares on the market, nor did he express any opinion as to the price which could have been obtained for a block of 2,500 shares sold outside of the exchange. The second witness said the market would have been changed two or three points by an offer of 500 shares; it could not absorb 5,000 shares without a price reduction of several points; and a distributing house would pay 8 or 10 percent under the last sale. He stated, after considerable hesitation, that in his opinion the fair market value of 5,000 shares would be 8 or 10 percent less than the exchange price. Later, he changed his testimony to say that the lower price would not reflect the fair market value. When he was asked what would happen if someone went into the market to buy 5,000 shares and another person went into the market to sell 5,000 shares, he replied that a sale of 5,000 shares would take place at the current market price. The third witness said that a sale to a distributor at about 5 points below the current market price would have been the most advantageous way to dispose of a block of 5,000 shares. Although he said that in his opinion the fair market value of a block of that size on any of the basic dates was the current market price less 5 points, he would not venture an opinion as to the price which would have been agreed upon between a willing purchaser and a willing seller dealing for a block of 5,000 shares where each was reasonably familiar with the facts and neither was under any compulsion to deal.

The testimony of these three witnesses has been carefully considered in an effort to give to that evidence such weight as it deserves. Yet, if their testimony and the stipulation were the only evidence, such evidence would probably be insufficient to show that the "fair market value" of any of the gifts made by these petitioners was less than the amount determined by the Commissioner. Counsel for the petitioners has neither filed a brief nor argued the case orally. Consequently, it is difficult to know exactly what he had in mind when he presented his evidence or to know what he thought of the case after all of the evidence was in. It is possible, of course, that he was convinced upon consideration of the evidence that the Commissioner had not erred. However that may be, he has not offered any argument to explain why he consistently inquired about the effect of throwing a block of 5,000 shares upon the market and refrained from inquiring as to the probable price between willing buyers and sellers.

Each of the gifts in question was of 2,500 shares. Each gift was separate from every other gift. The petitioners have claimed and are being allowed separate exclusions of $5,000 for each gift. Although each of the petitioners gave away a total of 5,000 shares on each date, and the total shares given by the two petitioners on each date was 10,000 shares, they have advanced no argument that blocks of 5,000 shares or 10,000 shares should be considered in determining the value of each gift of 2,500 shares. Cf. *Roth* v. *Wardell*, 77 Fed. (2d) 124; *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 185. They did not offer any evidence to show that the value of any gift of 2,500 shares was any less by reason of the fact that on the same day three other gifts of equal size were made. Cf. *Bingham* v. *Commonwealth*, 244 S. W. 781. Such a circumstance might possibly be material in some cases as, for example, in the case of a gift of perishable goods, where the value could be realized by the donee only through a sale on the market. But the property donated in this case was not perishable. It had a continuing value and the benefit to the recipient was not dependent upon a sale. Indeed, the trusts provided that the gifts should be retained for a considerable time without sale. Therefore, it seems important to keep in mind only blocks of 2,500 shares. Furthermore, the petitioners have advanced no argument to support their theory that fair market value is to be determined by the effect of throwing large blocks of stock on the exchange for sale on one day or, in the alternative, of disposing of those blocks by private sale through distributors. Cf. *Walker* v. *People*, 61 N. E. 489. They assume that the thin market was due to a shortage of buyers and failed to realize that it may have been due to a shortage of sellers. While an offer of 5,000 shares on a single day might have depressed the market in one case, it might have had the opposite effect in the other. Another possibility would have been to feed the shares into the market intelligently over a reasonable period of time. Cf. *In re Cook's Estate*, 100 N. Y. S. 628.

Although we are not convinced that it is of primary importance in this case to determine the effect of throwing large blocks of stock on the exchange for sale on each of the basic dates (cf. *Spaulding* v. *Martin*, 183 Atl. 281), nevertheless some discussion of the testimony of the petitioners' witnesses and of market conditions indicated by the stipulation may not be amiss. The witnesses were familiar with the market activities in Newberry stock and had some general knowledge of the Newberry Co. but they had made no special study of the history and earnings of that company. Two of the three witnesses did not express any opinion as to the price which would probably have been agreed upon on any of the basic dates for blocks of 2,500 or 5,000 shares between willing buyers and sellers reasonably familiar with the facts and under no compulsion to deal. The third witness expressed the

opinion that that price would be the current market price on any of the basic dates.

The record of sales for 30 days prior and subsequent to July 6, 1934, indicates that relatively few shares of the stock were changing hands during that period. There were no sales on many days, while on others the sales were limited to small blocks. However, 3,200 shares were sold on 4 days, July 25, 26, 27, and 30. A small sale had taken place on the 24th at 40½. The price ranged from 38 to 40 on the 25th, when 700 shares were sold. It varied from 31 to 37½ on the 26th when 1,100 shares were sold, and it closed on the 30th at 34. The next sale was at 37½ on August 3. Those figures might indicate that the sale of the 3,200 shares had driven the market down. The record of sales for 30 days prior and subsequent to August 1, 1935, shows a great many more sales. Furthermore, although 2,800 shares were sold on July 9, 1,600 on July 10, and 1,700 on July 11, there was a small but steady rise during those days in prices. The prices held up under sales and even increased during this period. Three thousand one hundred shares were sold during the week of August 1 with little or no market fluctuation. It is difficult to believe that the market as it actually existed at that time could not have absorbed 2,500 or even 5,000 shares within a reasonably short time without any decline in the market price. The figures for the period around December 26, 1935, show fewer sales, yet there were substantial sales on various days during that period without any substantial change in the prices. Three thousand four hundred shares were sold on December 4 and 5, and the market prices increased during those days. The prices were fairly steady over the entire period. The records themselves do not indicate that if there had been a willing seller on any of the basic dates of blocks of the size here in question, he would have been unable to dispose of his shares within a reasonable time on or about the basic dates at prices substantially the same as the then current market prices. His offer might have improved the market, it might have had no influence on the market, or it might have forced the market down. The last assumption seems no more reasonable than the other two.

The question for determination is the fair market value of a block of 2,500 shares on each of the basic dates in the light of all of the evidence in the case. The probable effect of throwing 10,000 shares on the market on any one of those days is merely evidentiary at most. These petitioners had no desire to sell the stock on any of the basic dates but had entirely different uses for the shares. If counsel for the petitioners has assumed only a willing seller, he has been in error. One attempting to give an opinion of fair market value, as defined for present purposes by the Board and the courts, must assume that on the basic date there was a willing seller and also a willing buyer. This is necessary in order to do justice to both taxpayer and Govern-

ment where, as here, a sale of the property was not even contemplated by the donor and donee and yet a value must be determined. Cf. *United States* v. *New River Collieries, supra; Brooks-Scanlon Corporation* v. *United States*, 265 U. S. 106, 123–124. Here there is no more reason to believe from the evidence that there *was* a willing seller of 2,500 or more of the shares on any basic date than there is to believe that there *was not* a willing buyer for that number of shares. The witnesses for the petitioners, in stating that the best way to dispose of 5,000 shares was to sell them privately at a discount from the exchange price, were assuming that there were willing sellers, but, apparently, were failing to assume the existence of a willing purchaser on the exchange. They went, instead, to the exchange records in an effort to determine the number of actual purchasers and the probable reduction in prices which would have to occur before a sufficient number of willing purchasers would appear. The petitioners, as we have already said, have advanced no argument to show that such a method of procedure is sound in determining "fair market value."

However, the decision does not have to be made upon the testimony of the petitioners' witnesses standing alone. There is, in addition, the testimony of two witnesses called by the respondent. They were shown to be men well qualified by experience and training to express opinions as to the value of the gifts in question on the basic dates. We believe that no one interested in determining the fair market value of the Newberry stock on these basic dates would fail to be impressed by the testimony of these two witnesses. Not only were they familiar with the actual records of sales of the Newberry stock, but they had also studied the history of the Newberry Co. and its business. They had made studies of market conditions and economic conditions, and had made careful comparison of the Newberry Co. and stock with other similar companies and their stocks. They considered the current market price on or about each basic date as the best and most reliable starting point from which to determine the fair market value of a block of 2,500 or more shares on those particular dates. They considered the fact that 10,000 shares in all were given on each basic date. They studied market conditions and other conditions which might have had some effect in producing the exchange prices to learn, if possible, whether those figures were to any extent artificial or whether they could be accepted as a reliable gauge of the fair market value of the stock in larger blocks on each basic date. They came to the conclusion, after considerable study, that those figures were reliable and were the best indication of the value of blocks such as were the subject of the gifts in question. We have carefully considered the testimony of these witnesses in an effort to give to it the weight which it deserves.

A review of the testimony of all five witnesses shows that three of them have expressed the belief that the price which probably would

have been agreed upon for blocks of 2,500 or 5,000 shares on each of the basic dates between willing buyers and willing sellers, not under compulsion to trade but having reasonable knowledge of the facts, would have been the exchange prices multiplied by the number of shares in the blocks. No witness has expressed a contrary view. One witness stated that in his opinion the "fair market value" of such blocks on the basic dates would have been 5 points under the current market price on the exchange. However, it appears from his testimony that the "fair market value" to which he referred was not the price which would be agreed upon between a willing purchaser and a willing seller dealing for a block of 5,000 shares, where each was reasonably familiar with the facts and neither was under any compulsion to deal. We have studied the figures and the facts disclosed by the stipulation of the parties in an effort to properly appraise the testimony of the witnesses and to assign proper weight to the evidence stipulated. The conclusion which we reached, after fully considering all of the evidence before us, is that the Commissioner correctly determined the value of each gift in determining the deficiencies.

*Decision will be entered under Rule 50.*