*612 OPINION.
Kern:
1. Petitioners were the owners of certain “6% Convertible Obligations” of the Associated Gas & Electric Co. It is stipulated by the parties that the terms of these obligations contained “provision for payment of interest by action of the Board of Directors regardless of the existence * * * [of any conditions attached to the pay *613 ment of interest], in which case payment may be made in cash and/or ‘securities’ as defined in Board resolution and such payment shall be deemed to the amount of the value of said securities as fixed in such resolution.” The phrase “conditions attached to the payment of interest” evidently refers to a provision that interest on such obligations shall be payable without action of the board of directors if dividends shall have been paid on the corresponding preferred stock into which these obligations were convertible. On September 22,1936, the board of directors of the company adopted a resolution to the effect that “this Board * * * does hereby declare and direct the payment of * * * interest for the period beginning June 1,1983 and ending November 30,1933 on the 6% convertible obligations * * * and does hereby determine that such interest shall be paid in obligations of this Company maturing October 1,1941 to be designated ‘Scrip Certificates for Interest on Convertible Obligations’ ”; that these Scrip Certificates should bear interest at the rate of 4% payable out of “Available Net income” but payable as to principal and accumulated interest at maturity without regárd to “available net income” but subordinated to the senior indebtedness of the company; and that “the interest hereby declared on the Convertible Obligations * * * shall be charged against Capital Surplus of the Company.” Similar resolutions were adopted with regard to the payment of interest on the convertible obligations for the period December 1, 1933, to May 31, 1935, and for the period June 1, 1935, to November 30, 1936, these resolutions being adopted under date of October 16, and November 6, 1936, respectively. Pursuant to these resolutions scrip of the company was issued and distributed to the petitioners herein, who received and retained it. The scrip was readily transferable; there was an active market for it immediately upon its issue, the sales being “over the counter” transactions; and it had a market value during the taxable year of 35 cents on each dollar of its face value.
Under these facts the first question posed herein is whether petitioners, on a cash basis, received taxable income during the year 1936 by reason of their receipt of this scrip, to the extent of its fair market value.
Our answer is in the affirmative. This scrip was not issued to petitioners merely to evidence or renew an existing interest obligation, but was issued in payment and satisfaction of this obligation pursuant to the provisions of the “6% Convertible Obligations” which they held and the resolutions of the board of directors of the company authorizing its issue. It was received and retained as such by petitioners regardless of their dissatisfaction with this medium of payment. The scrip had an established market value of its own and there was active trading in it. Under these facts the receipt by peti *614 tioners of this scrip constituted the payment to them of interest by property having a market value and to the extent of this value they received income. See arts. 22 (a)-l, 22 (a)-8, and 115-10, Regulations 94; Patterson v. Anderson, 20 Fed. Supp. 799; G. C. M. 14182, 14r-1 C. B. 152.
In so far as these factual elements are lacking in the cases cited by petitioners, they are inapplicable to the question here presented. Cf. San Jacinto Life Insurance Co., 34 B. T. A. 186.
2. We come, then, to the question of the scrip’s value. We have found as a fact that the scrip when received by the petitioners in 1936 had a fair market value of 35 cents for every dollar of its face value. It was never quoted on the exchanges, but was sold actively and in considerable amounts over the counter by New York brokers. We need not enter here upon a detailed consideration of the contingencies of payment of the scrip, since it had an established market value. As the Circuit Court of Appeals for the Second Circuit said in Rogers v. Helvering, 107 Fed. (2d) 394, 396:
All this is well understood, and for this reason the price at which shares are sold is ordinarily the best test of their value. It is quite true that, even in wide markets where there are many buyers and sellers, these often do not know the more important facts about the company, and their consensus of opinion is not necessarily a proper measure of value, if by that be meant a truly informed judgment; nevertheless, sales are usually the most reliable evidence, and in any case they should weigh heavily. We cannot therefore say that, in the case at bar, the Board were bound to prefer the calculations of experts, drawn from the books, to sales even of such small blocks as forty shares or less; or to quotations of brokers who dealt in the shares. Robertson v. Routzahn, 6 Cir., 75 F. 2d 537, 539.
Petitioners object to a finding of value on these sales because of the contention that the sale of large blocks of the scrip at one time would depress the market to the point of extinction.
The one expert witness who testified on this subject was a broker. He stated that if the holdings of petitioners in this scrip had been placed upon the market it would have resulted in a substantial reduction in the price at which they could have been sold. On cross-examination he was asked as to the effect on the market if petitioners’ scrip had been sold over a long period of time. His answer was as follows:
A. Well, no doubt tbat if they bad given me a period of two years I might have been able to liquidate tbeir entire holdings, but the very fact that that block of scrip never come into the market and, as we would say, it was tied off the market, it did not interfere with what constituted the ordinary flow of scrip coming in or going out of the market, but with that additional scrip coming in the market, it is impossible for me to answer what the price would have been.
*615 In view of tbe fact that one brokerage firm sold $966,055.35 face amount of tbis scrip in the period of October 13, 1936, to September 30, 1937, that this amount was approximately 60 percent of all the scrip sold, and that the total of such scrip outstanding was only $10,439,761, we must conclude that the market for the scrip was active and capable of absorbing petitioners’ holdings if sold intelligently over a reasonable period of time. While the sales were made for the most part in small lots, the volume of total sales and the activity of the market were such as to demand that great consideration be paid to the market prices as evidence of fair market value.
However, in the light of the testimony of this witness we must also conclude that the absorption by the market of petitioners’ scrip would result in some reduction of the price thereof if the sales were to take place within a reasonable period. Therefore, instead of taking the average price at which the scrip was sold by this brokerage firm during 1936 (approximately 42) as the sole factor determining the amount of market value, we have considered all the factors presented by the evidence and have determined that the market value of petitioners’ scrip was 35. See John J. Newberry, 39 B. T. A. 1123; Augustus E. Staley, 41 B. T. A. 752; Estate of Leonard B. McKitterick, 42 B. T. A. 130; Bull v. Smith, 119 Fed. (2d) 490.
3. The only remaining question is whether petitioners, on the well established principle of agency, qui faeit per alivm faoit per se, are liable for the negligence penalty by reason of the failure of their bookkeeper, Sweeney, who prepared their income tax returns, to return their scrip in 1936 as income.
The respondent grounds his case on the fact that Sweeney, in 1933, against the advice of petitioners’ counsel, treated the scrip received by them in 1933 (and not here in question) as income at its face amount on his books and carried it to the profit and loss account, and at the same time returned it as income at 10 percent of its face value. This seems to have been an arbitrary amount fixed by Sweeney, so as to disclose the scrip’s receipt without conceding that it had any real value. No protest was made by the petitioners about the scrip being treated as income in 1933 and no claim of refund was filed for that year. At the hearing Sweeney professed to be familiar with the Treasury rulings in regard to scrip which was issued in payment of dividends but denied knowledge of any ruling in regard to scrip issued in payment of interest. In 1936 Sweeney treated it as income on his books but not on the returns made out for petitioners. He did so in the latter year on the advice of counsel. Respondent points to these facts as establishing negligence on the part of petitioners.
*616 We do not agree with respondent’s contention. There is no question as to Sweeney’s honesty of doubt with regard to the taxability of this scrip. It was and is a matter of a controversial nature and Sweeney was not negligent in consulting with petitioners’ attorney with regard to it and following his advice. The failure to report this scrip as income in the taxable year was due to an honest misunderstanding of law and not to negligence.
Therefore, no penalty attaches.

Decision will be entered, wider Bule 50.