H. Smith Richardson v. Commissioner.
Richardson v. Commissioner
Docket No. 95770.
United States Tax Court
1943 Tax Ct. Memo LEXIS 45; 2 T.C.M. (CCH) 1039; T.C.M. (RIA) 43496; November 30, 1943
*45 Holt S. McKinney, Esq., 122 E. 42nd St., New York, N. Y., for the petitioner. Thomas H. Lewis, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent originally determined a deficiency in petitioner's gift tax for the year 1935 in the sum of $48,918.87. Petitioner alleges that the overpaid his gift tax for that year in the sum of $72,165.43 which he asks to be refunded. Respondent, by amended answer, prayed that the amount of the deficiency be determined in the amount of $109,615.87. The questions are: (1) What was the value, on December 20, 1935, of the common stock of Vick Chemical Inc. and Piedmont Financial Co., Inc. transferred by petitioner in trust for his children; (2) were these gifts of future interest; and (3) did the income from certain trust property transferred to petitioner, as trustee, by his wife in 1932, constitute a gift from petitioner to his children who were the beneficiaries of the trust, upon its accumulation for their benefit? Findings of Fact The petitioner, H. Smith Richardson, is a resident of Connecticut, and duly filed his gift tax return for the year 1935 with the collector of internal revenue at Hartford, Connecticut. *46 On December 20, 1935, petitioner transferred as gifts 12,487 shares of common capital stock of Vick Chemical, Inc., in trust for his five children, as follows: 4,300 shares for H. Smith Richardson, Jr.
3,687 shares for
Robert Randolph Richardson
500 shares for
John Page Richardson
2,000 shares for
Mary Keen Richardson
2,000 shares for
Grace Richardson Stetson
On the same day, he also transferred as gifts 5,100 shares of the capital stock of Piedmont Financial Co., Inc. in trust for four of his children. 1,800 shares for
H. Smith Richardson, Jr.
800 shares for
Robert Randolph Richardson
1,000 shares for
Mary Keen Richardson
1,500 shares for
Grace Richardson Stetson
Petitioner valued the 12,487 shares of Vick Chemical stock, in his gift tax return, at $42 5/8 per share, and the 5,100 shares of Piedmont Financial stock at $99.11 per share. Petitioner now contends that the Vick Chemical stock had a fair market value of not more than $33 a share on December 20, 1935, and that of the Piedmont Financial had a fair market value on December 20, 1935 of not in excess of $50 per share. Respondent has determined that the Vick Chemical stock had a fair market value on *47 December 20, 1935, of $42.625 a share, and the stock of Piedmont Financial had a fair market value on that date of $95.509. VICK CHEMICAL, INC. The average of the high and low prices at which 400 shares of Vick Chemical stock were sold on the New York Stock Exchange on December 20, 1935, was $42 5/8. Vick Chemical, Inc. was incorporated under the laws of Delaware on August 12, 1933. It was formerly one of the subsidiary corpanies of Drug, Inc. and upon the dissolution in 1933 of Drug, Inc., the stock of Vick Chemical was distributed to the stockholders of Drug, Inc. From the date of its organization to and including December 31, 1935, Vick Chemical was engaged in the products for the relief of colds, known as Vicks Vaporub, Vicks Va-Tro-Nol, Vicks Medicated Cough Drops, and Vicks Voratone. Throughout the period under consideration here, there were outstanding 700,280 shares of its common stock of the par value of $5 per share. The consolidated net earnings of Vick Chemical and its subsidiaries for the years ended December 31, 1933 to June 30, 1938, inclusive, were as follows: Year
Net Earnings
1933
$2,339,296
1934
2,417,834
6 mos. (Jan. 1-June 30, 1935)
1,044,751
3 mos. (July 1-Sept. 30, 1935)
840,104
3 mos. (Oct. 1-Dec. 31, 1935)
599,933
Fiscal year ended June 30, 1936
2,709,334
Fiscal year ended June 30, 1937
2,953,515
Fiscal year ended June 30, 1938
2,248,138
*48 Its consolidated earnings and dividends paid per share during the same period were as follows: Div.
Earnings
paid
per
per
Year
share
share
1933
$3.34
$ .60
1934
3.45
2.40
6 mos. (Jan. 1-June 30, 1935)
1.49
1.20
3 mos. (July 1-Sept. 30, 1935)
1.20
.60
3 mos. (Oct. 1-Dec. 31, 1935)
.85
.60
Fiscal year ended June 30, 1936
3.87
2.40
Fiscal year ended June 30, 1937
4.23
4.20
Fiscal year ended June 30, 1938
3.21
2.40
Vick Chemical stock was listed on the New York Stock Exchange, and was bought and sold in the quantities and at the yearly high and low prices indicated below. Number
Year
shares sold
High
Low
1933
106,400
31    23 1/8
1934
112,450
36 3/4
24 5/8
1935
71,900
44 1/8
34    1936
55,150
48 1/4
40    1937
56,200
47    35 3/4
1938
35,300
42    30 1/2
The number of shares sold on the New York Stock Exchange, and the monthly high and low prices thereof from June 1935 to June 1936 were as follows: Month
Shares sold
High
Low
June, 1935
5,300
38 1/8
35    July
4,000
38    36 1/2
August
4,900
37 3/4
36 1/2
September
6,200
39 1/4
36 5/8
October
4,900
41    37 1/2
November
6,500
43 1/4
40    December
5,200
44 1/8
44 1/4
January, 1936
3,500
45    42    February
4,200
46    42 3/4
March
5,250
45 3/8
43 1/4
April
3,900
45 1/8
40    May
1,800
43 1/8
40    June
3,300
45    42 1/2
*49 The sales of Vick Chemical on the New York Stock Exchange by days from December 20, 1935 to January 20, 1936, were as follows: December
1935
Shares sold
High
Low
20
400
43
42 1/4
21
100
42 3/4
42 3/4
22
Sunday
23
200
42 1/2
42 1/2
24
100
42 3/4
42 3/4
25
Christmas
26
No sales
27
300
42 1/4
42 1/8
28
No sales
29
Sunday
30
100
42 1/2
42 1/2
31
100
43
43
January
1936
1
New Year's Day
2
No sales
3
100
42 7/8
42 7/8
4
No sales
5
Sunday
6
No sales
7
No sales
8
100
42 1/4
42 1/4
9
200
42 5/8
42 1/2
10
400
42
42
11
200
42 1/2
42 1/2
12
Sunday
13
200
43 1/2
42 7/8
14
No sales
15
No sales
16
100
43 5/8
43 5/8
17
100
43 5/8
43 5/8
18
No sales
19
Sunday
The balance sheet of Vick Chemical as of June 30 and December 31, 1935, and June 30, 1936, is as follows: VICK CHEMICAL, INC. (VICK CHEMICAL CO.)
Balance Sheet as Reflected by Books
June
December
June
Assets
30, 1935
31, 1935
30, 1936
Cash in banks and on hand
$3,021,178
$1,953,265
$1,302,846
U.S. Government securities
1,995,731
3,538,223
4,415,158
Other marketable securities
373,245
363,146
350,250
Short-term commercial notes at discount value
797,502
Gold held abroad, purchased with foreign funds - at market
value
717,666
1,603,465
504,379
Inventories
1,181,444
1,111,360
Accounts and Notes receivable, net
318,457
845,763
319,415
Other investments
25,000
140,880
Property Accounts
Land
71,563
71,425
71,286
Buildings
390,792
390,792
389,995
Machinery, equipment, etc.
409,909
418,399
428,067
Improvements in progress
5,855
133,999
Total
$ 872,264
$ 886,471
$1,023,347
Less: Depreciation Reserve
359,976
382,530
402,409
Balance
$ 512,288
$ 503,941
$ 620,938
June
December
June
Property Accounts
30, 1935
31, 1935
30, 1936
Advertising supplies and deferred charges
$ 168,855
$ 141,774
$ 52,792
Trade marks, good will, etc.
1
1
1
Total assets
$8,313,865
$8,949,578
$9,615,521
Liabilities
Accounts payable, accrued expenses, etc.
$ 267,351
$ 354,830
$ 443,407
Accrued Federal, State and Foreign income taxes
407,977
356,454
504,696
Total current liabilities
$ 675,328
$ 711,284
$ 948,103
Capital stock (700,280 shares $5.00 par value)
3,501,400
3,501,400
3,501,400
Capital surplus
1,752,648
1,752,648
1,752,648
Earned surplus
2,384,489
2,984,246
3,413,370
Total liabilities
$8,313,865
$8,949,578
$9,615,521
NET WORTH
Total capital stock and surplus
$7,638,537
$8,238,294
$8,667,418
Net worth per share
10.91
11.76
12.37
*50 The fair market value on December 20, 1935 of the shares of Vick Chemical stock given by petitioner to the trusts for his children was $532,258.37 or $42.625 a share. PIEDMONT FINANCIAL COMPANY, INC. The Piedmont Financial Company, Inc. was organized under the laws of Delaware on December 22, 1925. Its issued and outstanding stock on December 20, 1935, and at all times since its organization, consisted of 100,000 shares of common stock of no par value. Its stock has never been listed on any market, and, on December 20, 1935, was held by 33 stockholders, all of whom were members of the Richardson family, consisting of petitioner and his brother, and the wife and family of each. The business of the corporation was chiefly that of investing its funds in stocks and securities of other companies. Its portfolio of investments, on December 31, 1935, consisted of the following securities, shown at their cost or book value, and was not materially different on December 20, 1935: Number
Cost or
of shares
Company
Book value
200
Guaranty Trust Co. of N. Y.
$ 50,258.75
236,406
Vick Financial Corp.
928,598.23
21,365
Bristol-Myers Co.
698,125.94
10,632
Life Savers Corp.
167,277.75
20,000
Sterling Products, Inc.
966,865.19
13,562
Sterling Products, Inc.
854,406.00
42,216
United Drug, Inc.
274,495.62
31,115
Vick Chemical, Inc.
904,635.26
200
Allied Chemical & Dye Corp.
29,275.00
2
American HomeProducts
161.25
4,059
American Ins. (Cost $69,405.00 less reserve for realization $17,652.75)
51,752.25
2,000
American Radiator & Standard San. Corp.
18,212.50
400
American Smelting & Ref. Co.
17,560.00
500
American Telephone & Telegraph
58,962.50
800
Best & Co. Inc.
16,725.00
709
Central Insurance Co. C/P
255.24
600
Corn Products Co.
44,450.00
2
Coty, Inc.
125.50
500
DuPont de Nemours & Co.
29,452.50
500
Eastman Kodak Co. of N.J.
44,050.00
1,000
Electric Storage Battery Co.
45,825.00
1,180
First Natl. Amusement Corp. Class A
1,180
First Natl. Amusement Corp. Class B
11,570.47
500
General Am. Trans. Corp.
12,520.00
2,009 5/55
General Motors Corp.
44,795.00
600
Humble Oil & Refining Co.
24,002.50
600
Johns Manville Corp.
14,987.50
2
Lambert Co.
$ 280.50
3
Lehn & Fink Products Co.
132.00
2
McKesson & Robbins
110.75
100
Melville Shoe Corp.
5,817.50
200
Owen Illinois Glass Co.
14,885.00
1,000
J. C. Penny Co.
34,945.00
2
Plough, Inc.
36.00
800
Pullman, Inc.
32,207.50
100
Safeway Stores, Inc.
5,217.50
500
Sears, Roebuck & Co.
24,012.50
1
Vedasco Sales Corp.
.50
500
William Wrigley, Jr. Co.
25,355.00
Foreign Corporations
2,500
Hallinger Cons. Gold Mines, Ltd.
44,426.13
1,600
Int. Nickel Co. of Can. Ltd.
27,437.50
1,000
Lake Shore Mines, Ltd.
51,409.15
1,000
Noranda Mines, Ltd.
33,232.70
3,000
Wright-Hargreaves Mines Ltd.
36,487.68
Affiliated Company
2,281
Richardson Realty, Inc. Cons.
486,696.97
*51 United States Govt. Obligations
Acct. Int.
U.S. Treasury Notes
Cost
Dec. 31, '35
Total
Series B 3 % due Apr. 15, 1937 $50 M
$52,484.38
$312.50
$52.796.88
Series C 3 % due Feb. 15, 1937
50 M
52,484.38
562.50
52,906.25
Series C 3 % due Mar. 15, 1938
50 M
52,562.50
437.50
53,000.00
Series A 3 1/4 % due Aug. 1, 1936
50 M
52,656.25
677.08
53,333.33
Series A 3 1/4 % due Sept. 15, 1937
50 M
52,875.00
473.96
53,348.96
Series A 2 1/8 % due June 15, 1939
50 M
5,118.75
4.43
5,123.18
Total Cost or Book Value
$6,392,543.43
Following is a tabulation of the mean prices at which securities owned by Piedmont sold on the stock exchange on December 20, 1935, and the number of shares held by Piedmont: Stock
Number owned
Number sold
Mean price
Vick Chemical
31,115
400
$ 42.625
Allied Chem. & Dye
200
3,300
146.0625
American Radiator
2,000
7,200
23.0625
Am. Smelting & Refining
400
4,800
58.0625
Am. Tel. & Tel
500
4,900
150.75
Best & Co.
800
400
54.625
Corn Products Ref.
600
1,500
68.0625
DuPont de Nemours
500
2,800
136.25
Eastman Kodak
500
1,400
155.75
Elec. Storage Battery
1,000
200
53.75
Gen. Am. Trans.
500
800
47.00
Gen. Motors Corp.
2,000
69,000
54.875
Hollinger Cons. Gold Mines
2,500
600
13.875
Humble Oil
600
6,000
60.25
Int'l. Nickel Ltd.
1,600
19,900
43.5625
Johns Manville
600
1,600
91.25
Lake Shore Mines Ltd.
1,000
900
52.50
Melville Shoe Corp.
100
100
62.25
Noranda Mines
1,000
405
44.125
Owens Illinois Glass
200
1,700
124.25
J. C. Penny Co.
1,000
1,400
79.1875
Pullman, Inc.
800
2,700
35.375
Safeway Stores
100
1,400
32.75
Sears, Roebuck
500
4,500
64.6875
Wright Hargreaves Mines
3,000
3,900
7.8125
Wm. Wrigley Jr. Co.
500
200
77.625
Bristol-Myers Co.
21,365
None (4,700 sold
during mo.)
41.0625
Life Savers, Inc.
10,632
100
27.50
Sterling Products
33,562
600
$ 63.625
United Drug, Inc.
42,216
21,200
13.375
Vick Financial Corp.
236,406
None (1,399 sold
during mo.)
9.35 (Stip. value)
American HomeProducts
2
1,000
33.875
American Ins. Co.
4,059
Not available
15.75
Coty, Inc.
2
2,700
6.875
First Natl. Amusement "A"
1,180
Not available
27.23
Guaranty Trust Co.
200
Not available
313.50
Lambert Co.
2
600
22.3125
Lehn & Fink
3
200
12.0625
McKesson & Robbins
2
900
9.3125
Plough, Inc.
2
Not available
18.00
Vadasco Sales
1
300
1.4375
Richardson Realty, Inc.
2,281
50.00
*52 The net earnings of Piedmont Financial Co., Inc., the earnings per share as shown by its profit and loss account, and dividends paid per share, for the fiscal years ended June 30, 1927 to June 30, 1936, inclusive, are as follows: Total
Earnings
Div. Paid
Year
Net Earnings
Per Share
Per Share
1927
$361,698.49
3.62
None
1928
201,487.78
2.01
4.95
1929
488,386.92
4.88
1.575
1930
604,317.75
6.04
None
1931
( - 296,333.57) (Loss)
(2.96) (Loss)
None
1932
251,224.18
2.51
None
1933
329,834.91
3.30
2.85
1934
133,268.56
1.33
4.35176
1935
323,973.65
3.24
2.52
1936
406,496.10
4.06
.7875
The following is the balance sheet of Piedmont as of June 30, 1934, 1935 and 1936: ASSETS
1934
1935
1936
Cash
$ 725,077.30
$ 372,187.24
$ 294,256.36
Accounts and Notes Receivable
180,628.45
209,441.89
22,462.76
Securities
6,409,402.79
6,629,046.65
6,961,276.83
Total
$7,315,108.54
$7,210,675.78
$7,277,995.95
LIABILITIES
Accounts and Notes Payable
435,176.00
252,105.00
795.49
Res. for Realization of Sec.
224,756.00
217,652.75
200,000.00
Debenture Bonds & Int.
252,083.36
Capital Stock
6,398,700.00
6,398,700.00
6,398,700.00
Capital Surplus
258,747.95
258,747.95
Earned Surplus
4,393.18
83,470.08
419,752.51
*53 The fair market value, on December 20, 1935, of the 5,100 shares of common stock of Piedmont Financial Co., Inc. was not less than $95.509 per share. 1932 TRUSTS On or about May 15, 1932, Grace Jones Richardson, wife of petitioner, executed and delivered five trust instruments, and conveyed to the trustee named therein, H. Smith Richardson, petitioner here, a total of 42,500 shares of the common stock of Piedmont Financial Co., Inc. The trust instruments were identical, except for the names of the several beneficiaries, who were the five children of the donor and the trustee. Each trust provided that the trustee should collect the trust income, and, until the beneficiary became twenty-one years of age, apply to the beneficiary's maintenance, education or benefit so much thereof as he, in his discretion, should deem advisable; the remainder to be accumulated and reinvested for the child's benefit; after the beneficiary became twenty-one years old, the trustee should pay to him or her such portion of the annual trust income, or any part of the accumulation which he, in his discretion, might determine; provided, that after the death of H. Smith Richardson, the succeeding trustee *54 should pay all of the annual income to the beneficiary, if the beneficiary was then 21 years of age; and, further, that when the beneficiary became 35 years old, the trustee was to pay over all of the accumulations and income therefrom, to the beneficiary. Upon the death of the beneficiary, the trust should terminate and the principal and undistributed income should be delivered as the beneficiary directed by last will and testament. Provision was made for its distribution to heirs of the beneficiary in the event of a failure of beneficiary to dispose of it by will. The trustee was given complete powers of management over the affairs of the trust, and, in addition, the power contained in the following item: Eleventh: During his lifetime, H. Smith Richardson, husband of the Grantor, may cancel and terminate this agreement by an instrument in writing duly exercised and acknowledged and filed with the Trustee or Trustees then acting, and upon such termination and cancellation the said H. Smith Richardson shall be entitled to receive the corpus of the trust fund absolutely and free from all trusts. The Fourteenth paragraph of the Trust instrument provided as follows: Fourteenth: *55 All stock dividends and dividends or cash payments in liquidation received by the Trustee on any of the stocks, bonds, securities, or other property comprised in the principal shall be part of the principal, and all stock dividends and dividends or cash payments in liquidation received by the Trustee on any of the stocks, bonds, securities, or other property comprised in the accumulations above mentioned shall be part of such accumulations. Extraordinary cash dividends shall be applied to income, or principal, or apportioned between principal and income by the Trustee in his uncontrolled discretion. Except as aforesaid, all dividends or cash payments received by the Trustee on any of the stocks, bonds, securities, or other property comprised in the principal shall be deemed part of the trust income, and all dividends or cash payments received by the Trustee on any of the stocks, bonds, securities or other property comprised in the accumulations above mentioned shall be deemed part of the income on said accumulations. It is stipulated that during the period from June 7, 1932, to December 31, 1932, and during each of the years 1933, 1934 and 1935, these trusts received income from *56 the corpora of the trusts which, in accordance with the terms of the trust instruments, was accumulated or distributed, as follows: Amt.
Amt. of
Paid to
Accumulated
Bene-
Income
ficiaries
June 7, 1932-Dec. 31, 1932
1933
$121,125.00
1934
270,937.50
150
1935
106,675.00
900
On December 30, 1941, the petitioner exercised the power granted by item "Eleventh" set forth above, and received in his own name and individual right 42,500 shares of the common stock of Piedmont Financial Co., Inc. which had constituted the corpora of the trusts. The income from the trust property was income to petitioner; the accumulation of the income for the benefit of the children named as beneficiaries in the trust instruments constituted taxable gifts from petitioner to such beneficiaries. FUTURE INTERESTS The 1935 trusts, created by petitioner, directed the trustee to accumulate the income from the trust property during the trust term, which was defined as expiring 20 years after the death of the last surviving child of the grantor, and upon the expiration of the trust to distribute the corpus and accumulated income as in the manner provided for in the trust instrument. *57 The trustee had the power, in his absolute and uncontrolled discretion, to apply any part of the income for the benefit of the beneficiary after he had reached the age of 21 years. These were gifts of future interests. Opinion KERN, Judge: The primary issue involved here is the question of the value, for gift tax purposes, of the shares of stock transferred in trust by petitioner as gifts to his five children on December 20, 1935. The total number of shares of Vick Chemical stock so transferred was 12,487, and the total number of Piedmont Financial shares was 5,100. The five trusts were given, re-respectively, 4,300, 3,687, 500, 2,000 and 2,000 shares of Vick Chemical stock and four of the trusts were given, respectively, 1,800, 800, 1,000 and 1,500 shares of Piedmont Financial stock. Among the assets of Piedmont Financial, which consisted largely of securities, were 31,115 shares of Vick Chemical stock. Petitioner suggests that, in valuing the stock of Vick Chemical which petitioner transferred, we must add to the total number of shares actually transferred by way of gift the 31,115 shares owned by Piedmont Financial for the purpose of determining whether the mean price of such *58 stock upon the exchange as of the date in question accurately reflected its fair market value, so that we should determine the value of 43,602 shares of Vick Chemical stock, rather than 12,487 which were directly disposed of by petitioner by five different gifts. We can find no justification for this contention, and petitioner cites no authority to support it. The 31,115 shares owned by Piedmont Financial were not the subject of any gift; they were simply among the assets of Piedmont, 5,100 of whose 100,000 shares were the subject of a gift by petitioner. The only gift which can be said to have been made as to the 31,115 shares of Vick Chemical stock held by Piedmont Financial was the gift of an equitable interest in 51/1000 of the assets of Piedmont, which, as applied to the Vick stock, would amount to fewer than 1,600 shares. We are required to value only the stock which was the subject of the gifts, which, as far as it relates to Vick Chemical stock, consisted of five blocks of 4,300, 3,687, 500, 2,000 and 2,000 shares, respectively, John J. Newberry, 39 B.T.A. 1123. We have heretofore indicated that the value of any one or all of the several blocks *59 of the same stock disposed of at the same time might under special circumstances be shown by the evidence to be affected by the simultaneous disposition of the others. Lawrence C. Phipps, 43 B.T.A. 1010, 1022. However, nothing in the instant case inclines us to consider the whole of a large block of Vick Chemical owned by another corporation in determining the value of the Vick Chemical stock which constituted the subject matter of the various gifts, even though a small minority of the stock of such other corporation was given simultaneously by the same donor to the same donee. Therefore, we have here considered our problem to be the determination of the fair market value of five blocks of Vick Chemical stock aggregating 12,487 shares, and 5,100 shares of the stock of Piedmont Financial Co., Inc. VICK CHEMICAL STOCK Vick Chemical Inc., was engaged, in 1935, in the manufacture of four medicinal products for the relief of colds. Throughout the period under consideration, there were outstanding 700,280 shares of common stock of the par value of $5 per share. It was listed on the New York Stock Exchange, and was continuously traded in to the extent *60 indicated in our findings of fact. On the date of the gift here in question 400 shares were sold at an average price of $42 5/8, and this is the value urged by respondent. Here the stock in question was bought and sold on an open public market. There is no hint that the prices were "rigged" or artificially supported. Therefore the prices at which the stock was sold on the open market at the pertinent date constitute the best evidence of their fair market value. See John J. Newberry, supra. Petitioner contends, however, that exceptional circumstances exist here which require us to determine the fair market value of the stock in question without reference to the prices at which it was selling on the market, the exceptional circumstances being that the market for the stock was so relatively narrow that the stock could not have been sold at the price prevailing on the crucial date. Such exceptional circumstances must be clearly shown by the evidence, before we abandon the clear and unequivocal evidence of prices prevailing on an open market and resort to speculation based upon opinions, which in turn are based upon dubious and necessarily inexact hypotheses. *61 See John J. Newberry, supra;Estate of Leonard B. McKitterick, 42 B.T.A. 130. After a careful consideration of the evidence before us, including the testimony of expert witnesses adduced by both petitioner and respondent, we are of the opinion that such exceptional circumstances do not exist in the instant case as would cause us to disregard the prices obtained for the stock in question on the open public market as the best evidence of its fair market value. Our conclusion is that, on December 20, 1935, the stock of Vick Chemical had a fair market value of $42.625 per share. PIEDMONT FINANCIAL CO. STOCK The Piedmont Financial Co., Inc. was a family holding corporation. Its stock was held by the members of the Richardson family and its assets consisted of securities having a definitely ascertainable market value. There was no market for the stock of Piedmont Financial, and it is obvious that it was not the purpose of the Richardson family to sell it on the open market. This function of the corporate stock of this company was to distribute among the Richardson family various beneficial interests in the securities transferred *62 to and owned by the corporation. Petitioner contends that no one except a "bargain hunter" would want to buy a minority stock interest in a family holding corporation, and then only for the purpose of realizing its assets upon a liquidation, which would have entailed heavy taxes. Therefore, he contends that we should find the fair market value of this stock to be not greater than $50.00 per share. If the arguments of petitioner were to prevail, any cohesive family owning securities having a market value readily ascertainable from trading on the open public market could organize a family holding corporation, transfer to such corporation the securities which it owns, and then deal with the stock of the family corporation on the basis that it has by reason of petitioner's arguments a market value of only approximately half of the market value of the securities owned by such a corporation, thus cutting in two gift taxes and estate taxes which would otherwise be payable on the transfer of the securities themselves. We cannot agree. Closely-held stock of a family holding company which was never sold on the open market and was never intended by the organizers of the corporation to be *63 sold, but was intended to be held by members of the family to evidence their respective beneficial rights in securities which were bought and sold by the corporation and which were dealt in on the open market, can only be valued in any real or practical way by primarily considering the value of the securities owned by the corporation. Any other approach would, in our opinion, be futile. As reflecting the market value of the securities owned by the Piedmont Financial Co., its stock was worth $98.08 per share. The respondent's determination was that this stock had a fair market value of $95.509. After having considered all of the relevant financial statistics and the facts disclosed by the record, including the opinions of the expert witnesses who testified herein, and having given due weight to those factors relevant and pertinent to the determination of the fair market value of this stock, we conclude that the stock of the Piedmont Financial Co. which was the subject of the gifts in question had, on December 20, 1935, a fair market value of not less than $95.509 per share. FUTURE INTERESTS In his amended answer, respondent raised the point that the gifts of petitioner *64 in trust for his children were gifts of future interests been erroneously allowed, and asked that the deficiency be increased as a result of the denial of the exclusions. The question is not discussed in petitioner's briefs. The trust instrument discloses that, in each instance, the trustee was authorized and empowered in his absolute and uncontrolled discretion at any time and from time to time after the beneficiary should have attained the age of twenty-one (21) years, to apply the income from the trust estate, or any part thereof, for the benefit of the beneficiary. Otherwise, the income was to be accumulated until the expiration of the trust term, which was fixed at twenty years after the death of the last surviving of the five named children, the donor. Upon the termination of the trust, the principal and accumulated income was to be distributed as provided by the beneficiary in his last will and testament, or, in the absence of such testamentary appointment by the beneficiary, to his descendants, if any, in equal shares; and if no descendants of the beneficiary were then living, then to descendants of the donor, in a manner specified. The beneficiary of each trust had no *65 right, at any time, to require the payment to him of any sum whatever, since complete and uncontrolled discretion was lodged in the trustee with respect to any such payment. These were clearly gifts of future interests, and the exclusions were improperly allowed. Welch v. Paine, 130 Fed. (2d) 990, Winston Paul, 46 B.T.A. 920, Lillian Seeligson Winterbotham, 46 B.T.A. 972, Mary M. Hutchings, 1 T.C. 692. 1932 TRUSTS With respect to the trusts created in 1932 by petitioner's wife, of which petitioner was trustee, for the benefit of their five children, the respondent, in his amended answer, contends that the income of the trusts were gifts from petitioner to his children, by reason of the extent of his control over the trust property, which we have heretofore (42 B.T.A. 830) held to have been tantamount to ownership, so as to render the income therefrom taxable to petitioner. Respondent says that since the income was petitioner's, the accumulation thereof for the children constituted a gift from petitioner to them. The petitioner *66 suggests that respondent has not sustained his burden of proof as to this issue, and, as to a trust mentioned in respondent's answer as having been created in December 1934, we readily agree. There is no evidence whatever, either by way of oral testimony, stipulation or exhibits, relating to any such trust. But as to the trusts originally created in 1932, we think the trust instruments together with their legal implication, and the stipulation of facts, sustain respondent's burden of proof, and his position, as well. The petitioner says there is nothing in the record to show whether the income referred to may have been capital gains, stock dividends, dividends in liquidation, or extraordinary cash dividends, all of which, under the terms of the trust, would have been treated as part of principal, and thus have remained subject to petitioner's control, negativing the possibility of a completed gift by petitioner. But the parties have stipulated that income from the corpora of the trusts was received by the trusts in the amounts indicated in our findings, and that this income was either accumulated for or distributed to the beneficiaries. This stipulation negatives the supposition *67 that any of the income was of the type which by the terms of the trust instrument was to be treated as part of principal. The petitioner next urges that petitioner did not make a gift of the income, since he did not make the transfer of the trust property in the first place but was merely the donee of a power. We thing that is immaterial. The trust property was, as we have seen, in effect, given to petitioner by the grantor, his wife. We have already decided as to this very taxpayer that his possession of the broad power to revoke the trusts and vest the trust property in himself made him, for tax purposes, the owner of the trust property and taxable on its income. H. S. Richardson, 42 B.T.A. 830. This decision was affirmed in the case of Richardson v. Commissioner, 121 Fed. (2d) 1, and certiorari was denied, 314 U.S. 684. When he, thereafter, allowed income from the property to be accumulated for his children, it was a gift from him to them. See Commissioner v. Warner, 127 Fed. (2d) 913; Leonard A. Yerkes, 47 B.T.A. 431. The case *68 of Edith Evelyn Clark, 47 B.T.A. 865, relied upon by petitioner is distinguishable upon its facts. In that case there was no question as to the ownership or gift of trust income. Petitioner finally and urgently argues that, in any event, there was no taxable transfer because of the provisions of section 452 (c) of the Revenue Act of 1942, which provides as follows: (c) Release on or before January 1, 1943. - (1) A release of a power to appoint before January 1, 1943, shall not be deemed a transfer of property by the individual possessing such power. (2) This subsection shall apply to all calendar years prior to 1943. Petitioner's position is based on his contention that any gift of the income involved here must be held to have taken place by reason of petitioner's failure to exercise a power to appoint himself as the taker of the property and that section 452 (c) specially provides that a release of a power to appoint does not result in a taxable transfer. Assuming, for the purpose of this discussion, that petitioner's power to appoint under the trust instrument was such a power of appointment as the statute comprehends, we do not believe that *69 a mere non-exercise of the power, where no time limit is imposed on its exercise, is such a release as is covered by section 452 (c). Where a power of appointment is intended by the grantor to be unlimited as to time, a holding that it is released as of any date upon which it is unexercised would defeat the intention of the grantor. In Edith Evelyn Clark, supra, cited by petitioner, the donee of the power relinquished it by amending the trust deed by striking out the article granting her the power. It seems altogether probable that some such action, incompatible with an intention to retain the power for future exercise, is necessary in order to constitute a release. An exception to this rule might exist where the power is expressly limited in time, and a failure to exercise it within the time allowed results in a termination of the power; in such a case, the failure to exercise it might be construed as, in effect, a release. Here, it is clear that petitioner did not intend to release his power of appointment in 1932, 1933, 1934 or 1935, because he exercised it in full in 1941. The Commissioner's action in this case is not predicated upon an assumption *70 that the gifts resulted from petitioners' failure to exercise his power of appointment. It rested, rather, on his contention that the trust property was, for tax purposes, the property of the petitioner, and that the income arising from it was therefore the petitioner's income. The disposition made of the income is attributable to him, and, in this case, constituted a gift from him to his children, not because he released, by non-exercise, his power to assume ownership of the corpus and the income, but precisely because he was the owner of them, for tax purposes, and applied the income upon which he was taxable by virtue of the ownership referred to, to the accumulation ultimately made for his children. Decision will be entered under Rule 50.