ESTATE OF LUCILE MARIE MCCORMICK, DECEASED, JOHN L. MCCORMICK, PERSONAL REPRESENTATIVE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of McCormick v. Commissioner
Docket Nos. 18417-91, 18418-91, 18422-91
United States Tax Court
T.C. Memo 1995-371; 1995 Tax Ct. Memo LEXIS 367; 70 T.C.M. (CCH) 318; August 7, 1995, Filed *367 Decision will be entered under Rule 155. For petitioners: Maurice G. McCormick. For respondent: Gail K. Gibson. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 369,839 Federal estate tax deficiency and gift tax deficiencies with respect to Lucile Marie McCormick, now deceased (decedent), and petitioner John L. McCormick (J.L. McCormick) as follows: Taxable Year Ended Dec. 31
1986
1987
1988
Decedent's Estate
$ 90,697
$ 8,255
--   J.L. McCormick
90,696
8,255
$ 38,615
After concessions by the parties, a series of issues remains, for gift and estate tax purposes, concerning the values on various dates of interests in entities engaged in real property development and sales. FINDINGS OF FACT [2]
Background
J.L. McCormick and decedent were married until decedent's death on September 17, 1987. Petitioners are decedent's estate (the estate) *368 and its personal representative, J.L. McCormick individually. References to petitioner in the singular are solely to J.L. McCormick. Petitioner resided in Hickson, North Dakota, at the times the petitions were filed in each of the three consolidated cases. On May 20, 1988, petitioner renounced any right of succession to decedent's interests in the business entities in question. Petitioner, along with his seven sons and a trust established by his father, owns McCormick, Inc. (MC), a holding company, which in turn owns all the stock of Northern Improvement Co. (NIC). NIC is engaged in interstate construction of concrete and asphalt roads and highways. NIC and MC were the primary sources of capital borrowing by McCormick Properties (MP) and McCormick Properties II (MP2), the subject real estate entities in these cases. McCormick Construction (MCC), a corporation engaged in construction in Arizona, was owned 14.78 percent by decedent during 1986 and at her death, and 5.5 percent by each partner in MP (prior to gifts made by petitioner on May 1, 1986); petitioner owned the remainder of MCC. On May 1, 1986, petitioner made gifts to 23 donees of interests in MP, ranging from .5 percent *369 to 3.175 percent and totaling 30.225 percent of the partnership. On July 1, 1987, petitioner made a gift of a .5-percent interest in MP to each of 23 donees. Using the gift-splitting provisions, petitioner and decedent filed gift tax returns reporting those gifts. Petitioner and his new wife (Glee McCormick) filed a gift tax return using the gift-splitting provisions to report 24 gifts of .75-percent interests in MP2 on December 1, 1988. At the time of decedent's death, she owned a 14.78-percent interest in MP, a 6.81-percent interest in MP2, and a 16.67-percent interest in Lazy S Ranch partnership. The Lazy S Ranch partnership interest was reported for estate tax purposes at a value of $ 127,556; the parties have agreed that the fair market value of that interest was $ 111,297 at the time of decedent's death. The following schedule reflects the estate tax values reported by the estate and those determined by respondent in the notice of estate tax deficiency: Value
Value Entity
Percent
Reported Determined
MP
14.78
$ 440,421
$ 949,063
MP2
6.81
85,468
255,645
For gift tax purposes, the parties, although using different amounts, used the same values for *370 the MP interests on the July 1, 1987, gift date as used for the September 17, 1987, estate tax valuation. For purposes of the May 1, 1986, gift tax valuation, each gift of a .5-percent interest in MP was reported by petitioner at $ 20,000, and determined by respondent to have a $ 30,090.37 value. Concerning the December 1, 1988, gifts of MP2 interests, petitioner reported a $ 18,600 value for each gift of a .75-percent interest. Respondent determined that each gift of a .75-percent interest had a value of $ 28,154.72. The Partnership Entities
MP is a general partnership, formed September 1, 1973, to own real property and engage in contracting business involving the building of roads, public utilities, and other structures. MP's partnership agreement permitted real estate ownership in any State; when the partnership was formed, it held real estate in North Dakota and Arizona. The initial partners of MP included petitioner (56.67 percent) and decedent (13.33 percent), and the remaining 30 percent was owned, 5 percent each, by six different individuals, including two of petitioner's children. In the event any of the 5-percent partners died, his legal representative was required *371 to offer the deceased partner's share to be purchased by MP on terms agreeable to the representative and MP. No similar requirement attached to the interests of any less than 5-percent partners. Interests in MP could not be transferred without consent of all of MP's partners. On November 4 and 10, 1977, two of the 5-percent partners of MP agreed to a buyout of their interests, each for $ 10,000. MP's partnership agreement was amended on June 15, 1987, giving partners holding a 5-percent or larger interest the right to call a partnership meeting. At that time, partners with 5-percent or larger interests included petitioner (32.775 percent), decedent (14.78 percent), Steve McCormick (9.23 percent), Tom McCormick (8.73 percent), Erv Johnson (5.555 percent), and Virgil Hardy (5.555 percent). The remaining 19 partners owned interests ranging from .5 percent to 3.175 percent. The 1987 amendment provided that the legal representative of any deceased partner was required to offer the deceased partner's interest to MP. At the time of decedent's death, she continued to own a 14.78-percent interest in MP. MP2, a general partnership, was formed January 1, 1984, for the purposes of purchasing, *372 owning, developing, and selling real estate. MP2 could also engage in contracting business involving the building of roads, public utilities, and other structures. MP2 was the developer of certain real property in Mohave County, Arizona, but could acquire real property in any State. Initially, MP2's partners were petitioner (29 percent), decedent (10 percent), John McCormick III (19 percent), Thomas McCormick (20 percent), Robert McCormick (10 percent), Erwin Johnson (6 percent), Paul McCormick (3 percent), Joe McCormick (2 percent), and Robert Aberle (1 percent). MP2's partnership agreement contained a buy-out provision if a partner died and a provision requiring the consent of all partners in order to transfer an interest. A May 15, 1989, partnership agreement reflected 27 partners, 22 of whom each had the McCormick family name and held a .75-percent ownership interest. Another McCormick owned a 1.5-percent interest. Those 22 partners all received their interests, by gift, from petitioner. The remaining 10 partners held the following interests: Petitioner (27.28 percent), decedent (6.81 percent), John McCormick III (12.94 percent), Thomas McCormick (20.00 percent), Robert McCormick *373 (6.81 percent), Erwin Johnson (4.08 percent), Paul McCormick (2.04 percent), Joe McCormick (1.36 percent), and Robert Aberle (.68 percent). A meeting of MP2 could be called by any partner owning an interest of 5 percent or more. The day-to-day operations of MP and MP2 were run by the executive board of each partnership, which consisted of petitioner, E.R. Johnson, and Tom McCormick. On July 1, 1987, petitioner gave 11.5 percent of his MP interest to 23 donees, thereby reducing his holding to 21.275 percent. On December 1, 1988, petitioner gave 18 percent of his interest in MP2 to 24 donees. On November 7, 1982, L&C Properties (L&C), a local Bullhead City real estate company unrelated to either petitioner, entered into a joint venture with MP to develop and sell six parcels of real property owned by L&C. L&C's real property capital contribution was valued at $ 1,124,000. MP, as its contribution to the joint venture, was to perform the following work: Install a water system for the subdivision (and bear cost of same), install streets and drainage, and install utilities (and bear cost of same). MP's contribution was to be computed based on direct and indirect costs, but was not to *374 include profit to MP. MP also agreed to pay costs for attorneys, engineering and county fees, marketing costs (above commissions), and real property tax until the property was sold to third parties. MP agreed to conduct the day-to-day activities of the venture, and to keep and maintain any books and records. The joint venture was to develop the land under a sequential plan, and costs incurred by MP were to be determined on a plat-by-plat basis. When MP's costs exceeded the value of a plat, MP was to receive interest until the costs were reimbursed to MP from joint venture receipts that exceeded current operating expenses. Proceeds from lot sales on each plat, after repayment of MP's excess contribution with interest, and after payment of reasonable and customary commissions and expenses, were allocated as follows: (1) MP would receive 80 percent, and L&C would receive 20 percent until MP had been paid for its expenses, including interest; (2) after MP was repaid, L&C would receive 80 percent and MP would receive 20 percent until L&C had received an amount equal to the value of the land contributed; and (3) any remaining sales proceeds would be split equally between the joint venturers. *375 The joint venture agreement would terminate by written agreement of the parties, by the sale of all property and distribution of all profits, or by any unauthorized alienation of an interest. The stated value of the real property, by agreement, would be increased 10 percent each year until all government approval to sell the land had been obtained. On November 3, 1984, with the consent of L&C, MP assigned its joint venture interest to MP2 in exchange for MP2's assumption of all outstanding and future obligations and expenses under the joint venture agreement. L&C changed its name in 1985, necessitating a new joint venture agreement, which differed from the prior agreement in some respects. In addition to providing for some changes in bookkeeping and including a provision for the filing of tax returns, the new joint venture agreement provided that all receipts were to be received by MP2 (which in turn would pay expenses and make distributions), and that any time MP2's contribution to the joint venture exceeded four times that of L&C's contribution, all distributions would be paid to MP2 until its contribution was no more than four times that of L&C's contribution. The new joint venture *376 agreement also provided for the contribution of 12 additional parcels of land, increasing the land value of the joint venture to $ 1,394,280. During 1990, Steve McCormick, on behalf of himself and his immediate family, purchased various interests in MP and MP2 from his brothers and a sister-in-law, as follows: Percentage
Date Entity
Purchased Amount Paid
1/31/90
MP
1.25
$ 27,681
1/31/90
MP
1.25
27,681
1/31/90
MP
1.25
27,681
1/31/90
MP2
2.50
55,362
2/28/90
MP2
1.00
22,145
4/01/90
MP
.50
17,027
4/01/90
MP2
.75
16,125
Petitioner had no involvement in the above sales, and no McCormick family member was required to sell his interest to Steve McCormick. The Partnerships' Real Property Operation
Real property (building lots) sales began in a 1980 marketing program in North Dakota and Minnesota where prospective buyers were offered free dinners in exchange for their attendance at a sales presentation. A few years later, the sales activity was relocated to Bullhead City (location of building lots), and a mailing program was used to lure prospective buyers by offering a free night's lodging and modest premiums in exchange for attendance at a sales *377 presentation. The sales pitches were presented by Cliff Randklev (Randklev), who, on July 10, 1985, entered into an exclusive broker and sales management agreement with MP and MP2 for the 1985 year. Randklev was to receive a 15-percent commission on all sales, and he was to pay salespersons' commissions. In addition, Randklev was to receive a bonus consisting of the difference between certain sales expenses (including his 15-percent commission) and 28.7 percent of total sales. The mail program concluded in 1988 because Bullhead City became better known, referrals from prior purchasers began occurring, and traffic increased due to the establishment of gambling at a nearby location. Bullhead City is on the border between Arizona and Nevada and is adjacent to Laughlin, Nevada, the third largest gaming area in Nevada, following Las Vegas and Reno. Bullhead City is situated in a fluvial plain with wash areas running the length of the city, which is situated along the Colorado River. The normal flow of water is westerly from the mountains on the east through the developed area of Bullhead City to the Colorado River. These geographical features and conditions present development and construction *378 water problems for the entire area. As a result, stringent drainage and floodplain requirements are prerequisite to the development of land in the Bullhead City area. MP's selling expenses, as a percentage of gross sales, were 32.4, 32.9, 71.7, and 22 percent for 1985, 1986, 1987, and 1988, respectively. The joint venture's selling expenses as a percentage of gross sales were 32.6, 25.8, and 19.4 percent for 1986, 1987, and 1988, respectively. In 1980, MP entered into a contract with the Hurschlers to purchase a 160-acre parcel along with a 480-acre parcel. After purchasing the 160 acres, MP advised the seller that it was unwilling to purchase the remaining 480 acres. The sellers brought suit during 1984, which resulted in a September 17, 1985, settlement. Under the terms of the settlement, the owners of the Hurschler property exchanged it with MP for the northeast quarter of the same section, and, in addition, MP paid $ 13,500. The Borjorquez property was a 215-acre undeveloped parcel south of what was to be the Bullhead City airport, 190 acres of which were exchanged by MP for a 190-acre parcel east of the airport. The remaining 25 acres were retained by MP. The Rio Lomas II *379 80-acre property is located in a floodplain and would require extensive construction to resolve the potential for flooding. In order to reduce some of their holdings, petitioner and decedent had decided to make a gift of partnership interests worth about $ 20,000 to each family member-donee. No formal appraisal was conducted at the time of the gifts of the partnership interests; however, petitioner looked at the annual reports of the partnerships before making the gifts. More than 95 percent of the land sales were on the installment basis with a 10-percent downpayment, and the balance paid over 10 years. For purposes of determining sales commissions, a sale was considered canceled if there was a rescission of the contract within 7 days after signing, or if a default in the payment occurred within the first year. The lots were sold under contracts for deed without passage of title until full payment. Accordingly, if a buyer defaulted, the seller, under Arizona law, would not be impeded from reselling the property without returning the money paid by the defaulting buyer. The joint venture entered into an agreement with Bullhead City requiring the joint venture to construct a sanitary *380 sewerage system to collect, transmit, and treat effluent within the boundaries of the joint venture's Sun Ridge Estates subdivision. Construction costs of up to $ 1 million and additional costs of up to $ 100,000 were to be repaid by the city over a 10-year period by monthly payments consisting of 90 percent of the individual lot owners' connection fees received by the city. In order to gain approval for construction of a subdivision, the following steps were followed: (1) Meetings were held with several divisions of the local government to outline plat development and to determine the local authorities' conditions for approval of a preliminary plat leading to a construction plan; (2) a 100-year water supply disclosure report was made to the local water district (these requests were being approved during the years under consideration); and (3) the final plat was approved and a disclosure document was filed with the Arizona Department of Real Estate (providing details to be available to prospective buyers of subdivision lots), and then the developer was given a license to sell lots. The requirements to register an Arizona development in California include the final plat approval, *381 an Arizona report on the subdivision, and an appraisal by an Arizona appraiser. For purposes of California registration, an appraisal report was completed on January 14, 1987. The report contained a price list for Sun Ridge Estates' lots, tract 4042C, as follows: 271 individual lots at $ 24,172, 71 multifamily lots at $ 50,880, and 35 commercial lots at $ 105,774. The actual sales of the lots averaged as follows: 155 individual lots at $ 21,978, 70 multifamily lots at $ 49,714, and 30 commercial lots at $ 104,500. The Sun Ridge Estates 4042E and 4042F parcels, as of September 17, 1987, had not been graded and consisted of precipitous terrain which needed substantial cutting and filling to prepare the grade for building lots. OPINION We must decide the value of percentage interests in MP and MP2 for estate and gift tax purposes. The valuation dates are May 1, 1986 (gifts, MP), July 1, 1987 (gifts, MP), September 17, 1987 (date of death, MP and MP2), and December 1, 1988 (gifts, MP2). Property includable in a decedent's gross estate or subject to gift tax is generally returned at its fair market value on the date of the decedent's death or on the date of the gift. Secs. 2031(a), *382 [3] 2501(a); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2501-1, Gift Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2501-1, Gift Tax Regs. The willing seller and buyer are hypothetical rather than specific individuals or entities. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The determination of value is to be made as of the valuation date (i.e., date of death or date of the gift), and knowledge of unforeseeable future events that may have affected the value cannot be attributed to the hypothetical buyer or seller. Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, 25.2512-3, Gift Tax Regs. *383 The issue is to be resolved factually from all the evidence and is a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Duncan Indus., Inc. v. Commissioner, 73 T.C. 266 (1979). Both parties have approached the question of fair market value by valuing the partnership's assets and then applying discounts for lack of marketability or because of a minority interest. The parties apply different discount rates, and there are three major areas of difference in their valuing of the underlying property. Those three areas involve the values of: The contract receivables, the development real property, and the undeveloped real property. In addition, both petitioners argue that the eventual tax burden on the partnerships' deferred income should be a factor which reduces the fair market value of the partnership interests. We shall consider each of these items separately. For purposes of litigation, the parties have reached various gift and estate tax values which are different from the reported and determined amounts. We set forth *384 respondent's statutory notice and trial values and petitioners' reported and trial values for each entity based on a .5-percent interest on all valuation dates other than December 1, 1988, where the interest was .75 percent, and the date of death (September 17, 1987), where a 14.78-percent interest is used for MP and a 6.81-percent interest is used for MP2: Petitioners Respondent Entity/Date
Reported
At Trial
In Notice
At Trial
MP 5/1/86
$ 20,000
$ 10,321
[1] $ 30,090
$ 25,469
MP 7/1/87
20,000
11,804
[1] 30,090
27,064
MP 9/17/87
440,421
348,919
949,063
800,000
MP2 9/17/87
85,468
42,943
255,645
142,000
MP2 12/1/88
18,600
11,457
[1] 28,155
25,371
I. MP -- Value of Disputed Underlying Assets
A. MP -- Contract and Joint Venture Receivables
With respect to MP, the parties valued the contract and joint venture receivables on each of the relevant valuation dates, as follows: Party May 1, 1986 Sept. 17, 1987 [1]
Respondent
$ 7,773,060
$ 6,074,693
Petitioners
7,640,000
6,010,000
Difference
133,060
64,693
*385 Regarding the May 1, 1986, valuation, both petitioners began with the end-of-year balance reflected by the partnership and reconciled back to May 1, 1986, by adjustments for transactions. The amounts involved represent 10-year installment payouts in varying stages of completion. Petitioners used an average 9-year remaining life and a 14-percent discount rate to determine the present value of the outstanding contracts or receivables. Petitioners also reduced the amount by a 2-percent carrying cost representing legal, accounting, and trust fees involving the receivables. Respondent used the figure developed for estate tax purposes, as of September 17, 1987, as a starting point and adjusted it based on a 10-percent inflation adjustment back to May 1, 1986. Taking this figure, which was to represent fair market value, respondent then applied a 12-percent market discount rate and 1-1/2 percent carrying cost, to arrive at a May 1, 1986, value for the contracts receivable that is $ 133,060 greater than petitioners' value. Regarding the September 17, 1987, receivables valuation, petitioners used the same method and percentages as used for the May 1, 1986, valuation. We find that both *386 parties' approaches are reasonable under the circumstances, and that the value reached by each side is within a reasonable range. Accordingly, we hold the value of MP's contract and joint venture receivables was $ 7,711,030 as of May 1, 1986, and $ 6,042,346.50 as of September 17, 1987. B. MP -- Undeveloped Real Estate
The parties valued MP's undeveloped real estate, on each of the relevant valuation dates, as follows: Party May 1, 1986 Sept. 17, 1987 Respondent
$ 2,406,830
$ 2,803,163
Petitioners
841,940
926,142
Difference
1,564,890
1,877,021
The gross difference between the parties' valuations is attributable to the sum of the values of several parcels of realty on each valuation date, as follows: May 1, 1986 Sept. 17, 1987 Acres Respondent Petitioners
Respondent Petitioners
160.00
$ 755,040
$ 288,000
$ 880,000
$ 316,800
215.00
755,040
261,225
880,000
290,250
80.00
480,480
129,600
558,621
144,000
36.00
216,216
53,460
251,379
58,320
27.08
68,640
24,372
80,000
26,809
26.00
94,380
42,120
110,000
46,800
Needles
[1] 37,034
[1] 43,163
[1] 43,163
[1] 43,163
Totals
2,406,830
841,940
2,803,163
926,142
*387 The parties, in support of their positions, have relied on witnesses proffered as experts in the valuation of real estate. In making our determination we may embrace or reject expert testimony if, in our judgment, either approach is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938). On the average, petitioners' valuations of the unimproved land were about one-third of the amounts reached by respondent. Respondent's expert was a qualified real estate appraiser who relied primarily on comparable sales of land to reach a value. Petitioners contend that respondent's expert could not accurately value the unimproved land, because the land was improved at the time it was observed for purposes of his valuation. Petitioners' proffered "expert" was John McCormick III, son of petitioner, who obtained real estate sales and broker's licenses in 1980 and 1986, respectively, and who has been the manager in charge of MP and MP2's real property development since 1980. John McCormick III estimated the per-acre value of the unimproved realty based on his personal knowledge, and he reduced the estimated values by 10 percent to reflect the selling expenses *388 associated with unimproved land. Respondent contends that, although John McCormick III was entitled to testify as to the value of the property under the Federal Rules of Evidence, he is not a qualified real estate appraiser, and, as a person with a financial interest in the outcome, he cannot be considered impartial or disinterested. We agree with respondent that under the Federal Rules of Evidence, John McCormick III may testify, as a lay or fact witness, regarding the value of the properties in question. We must also consider that there may be potential for bias in testimony given by a witness related to a party and/or a witness with a pecuniary interest in the outcome of the controversy. See, e.g., United States v. Abel, 469 U.S. 45, 51-52 (1984); United States v. DeSoto, 950 F.2d 626, 630 (10th Cir. 1991). The possibility for bias would tend to be exacerbated where said witness was providing testimony in the nature of conclusions rather than factual declarations based on personal knowledge. 1. 160-acre Hurschler -- Value of Undeveloped Realty on the May 1, 1986, and Sept. 17, 1987, Valuation Dates
In 1980, MP *389 entered into a contract to purchase a 160-acre parcel along with a 480-acre parcel. After purchasing the 160 acres, MP advised the seller that it was unwilling to purchase the remaining 480 acres. The sellers brought suit during 1984, which resulted in a settlement under which MP received the northeast quarter (160 acres) in exchange for the southwest quarter (160 acres) in the same section. John McCormick III referenced three comparable sales at $ 1,607, $ 2,500, and $ 3,467 per acre. Petitioners' proposed value for the Hurschler 160-acre parcel is $ 1,800 and $ 1,980 per acre on the 1986 and 1987 valuation dates, respectively. In this regard, petitioners' valuations include a 10-percent reduction of value for sales commissions, so that the gross per-acre values are $ 2,000 and $ 2,200, respectively. John McCormick III did not explain how his selected comparables were utilized in reaching petitioners' proposed value for the Hurschler property. Respondent's expert considered the zoning restrictions, an annual 7-percent growth rate in Bullhead City, and the potential purchase of lots by individual buyers for use during the early 1990s. Eleven comparable sales of development parcels *390 during the period mid-1984 through early 1988 were analyzed. The parcels ranged in size from about 40 to 480 acres, and the per-acre prices ranged from about $ 3,500 to $ 7,500. Adjustments, both upward and downward, were made to the comparables based on a 10-percent land inflation assumption, which was typical at the time of the valuation dates. In this regard, two of the comparable sales were of the same parcel and reflected a 13-percent annual appreciation for land. In addition, adjustments were made to account for differences in the size, shape, and location of the comparables vis-a-vis the Hurschler 160-acre parcel. After the adjustments, the average and median comparable values were $ 5,433 and $ 5,653, respectively. The comparable results were rounded to $ 5,500 per acre, for a total value of $ 880,000 (160 X $ 5,500) for the 1987 valuation, and adjusted to $ 4,719 per acre or $ 755,040 (160 X $ 4,719) for the 1986 valuation. Petitioners argue that any value advanced by the parties and determined by the Court should be reduced by 10 percent representing the sales commissions necessary to sell off the subdivided lots that will eventually be developed. Petitioners cite Estate of Grootemaat v. Commissioner, T.C. Memo. 1979-49, *391 in support of their argument. That opinion notes that a prospective buyer of land generally considers the rate of return on capital after the expenses of development and sale. In other words, a willing buyer would consider potential expenses in the process of formulating a purchase price. The sales expenses are not subtracted from the fair market value, but instead, represent one of many factors considered in reaching a fair market value. The properties under consideration are undeveloped parcels of land suitable for subdividing and sale. The fair market value of such property would, of necessity, include the prospective buyer's consideration of expenses necessary to develop and sell the raw land. Comparable land suitable for subdivision and sale is bought and sold for a price which includes such considerations. Accordingly, we reject petitioners' argument that the fair market value be reduced by 10 percent for possible selling commissions. Petitioners also contend that comparable sales on the installment basis do not represent a fair market value or the equivalent of a cash price. We cannot accept petitioners' postulation because there is no evidence supporting it. Petitioners *392 have not shown, for example, that installment sales generate a higher price reflecting disguised interest. We cannot assume that the comparable sales prices were inflated or deflated absent some evidence upon which to base such a finding. See Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. without published opinion 937 F.2d 612 (9th Cir. 1991) (in particular, see discussion at 56 T.C.M. 1269, 1282-1283, 1989 P-H Memo. T.C. par. 89,072, at 312-313.). We hold that respondent's proposed values of $ 755,040 and $ 880,000 as of May 1, 1986, and September 17, 1987, respectively, were the fair market values of the 160-acre Hurschler property. 2. 215-acre [4] Borjorquez Property -- Value of Undeveloped Realty on the May 1, 1986, and Sept. 17, 1987, Valuation Dates John *393 McCormick III concluded that the per-acre values of this property were $ 1,215 and $ 1,350 for the 1986 and 1987 valuations, respectively. Those figures include a reduction of 10 percent for sales commissions, and result in petitioners' proposed values of $ 261,225 and $ 290,250, respectively. Petitioners referenced one comparable sale during 1986 for $ 2,419 per acre. As with the Hurschler property, no analysis is provided to support petitioners' proposed values or to reconcile the difference between the proposed value and the comparable. Petitioners point out that this property, which was situated at the end of the runway of Bullhead City's new airport, and 190 acres were traded for property at a more desirable location. Those events, however, occurred subsequent to our valuation dates and have no bearing on value. Respondent's expert, with the same methodology as used in the Hurschler property, used the 11 comparable sales and made adjustments for time, size, shape, and location of the comparables vis-a-vis the Borjorquez 215-acre parcel. After the adjustments, the average and median comparable values were $ 3,943 and $ 3,957, respectively. The comparable results were rounded to *394 $ 4,000 per acre, for a total value of $ 880,000 (220 x $ 4,000) for the 1987 valuation, and adjusted to $ 3,432 per acre or $ 755,040 (220 x $ 3,432) for the 1986 valuation. We hold that fair market values of the 215-acre Borjorquez property were $ 737,880 (215 x $ 3,432) and $ 860,000 (215 x $ 4,000) as of May 1, 1986, and September 17, 1987, respectively. 3. 80-acre Rio Lomas II [5] -- Value of Undeveloped Realty on the May 1, 1986, and Sept. 17, 1987, Valuation Dates This property is located in a floodplain and would require extensive construction to resolve the potential for flooding. Petitioners proposed values of $ 1,800 and $ 2,000 for the 1986 and 1987 valuation dates, which, after a 10-percent reduction for selling commissions, resulted *395 in proposed values of $ 129,600 and $ 144,000 for 1986 and 1987, respectively. Petitioners referenced two comparables but again failed to reconcile them to their proposed values. Respondent's expert used the same methodology for this property as above, and arrived at a $ 6,006-per-acre value for 1986 and a $ 7,000-per-acre value for 1987. Those values would result in a proposed value for Rio Lomas II of $ 480,480 for 1986 and about $ 560,000 for 1987. In this instance, we find that respondent did not reconcile or adjust the comparables for the flood problems associated with this parcel, and that the fair market value of the 80-acre Rio Lomas II parcel was $ 312,240 as of May 1, 1986, and $ 359,311 as of September 17, 1987. 4. 36-acre Northeast Highlands -- Value of Undeveloped Realty on the May 1, 1986 and Sept. 17, 1987, Valuation Dates
John McCormick III estimated the per-acre values for this property to be $ 1,650 and $ 1,800 for 1986 and 1987, respectively. Petitioners indicated that this property needed "extensive grading", but offered no estimate of the costs involved or whether the amount needed was extraordinary so as to cause variation from the comparables. Respondent *396 proposed the same comparables and value for this property as she had for the Rio Lomas II property. We find no reason to reduce or increase respondent's reconciliation or adjustments to the comparables to arrive at a different value than proposed. Accordingly, we find that the 36-acre Northeast Highland parcel had a fair market value of $ 216,216 as of May 1, 1986, and $ 251,379 as of September 17, 1987. 5. 27.08-acre [6] Clearwater Hills -- Value of Undeveloped Realty on the May 1, 1986 and Sept. 17, 1987, Valuation Dates John McCormick III estimated the value of this parcel to be $ 1,000 and $ 1,100 per acre for the 1986 and 1987 valuation dates. Respondent's expert, after adjustments from the comparables, arrived at proposed values of $ 2,988 and $ 3,500 for the 1986 and 1987 valuations, respectively. We accept respondent's valuation and find that the *397 fair market value of the 27.08 acres Clearwater Hills property was $ 80,915 as of May 1, 1986, and $ 94,780 as of September 17, 1987. 6. 26-acre [7] Desert Ridge -- Value of Undeveloped Realty on the May 1, 1986 and Sept. 17, 1987, Valuation Dates John McCormick III estimated values of $ 1,800 and $ 2,000 for the 1986 and 1987 valuations, respectively. Respondent's expert, after making appropriate adjustments to the comparables, proposed values of approximately $ 2,999 and $ 3,495 for the 1986 and 1987 valuation dates. We accept respondent's valuation and find that the fair market value of the 26-acre Desert Ridge property was $ 77,974 as of May 1, 1986, and $ 90,870 as of September 17, 1987. C. MP -- Development Real Estate
The parties have proposed the following values for MP's development real estate as of September 17, 1987: Property
Petitioners Respondent
Clearwater Hills 4011B
$ 261,990
$ 440,000
Desert Glen
42,480
90,000
Sun Valley 4017
95,720
[1] 360,000
Sun Valley 4018A
101,540
-- Sun Valley 4018B
30,560
-- Rio Lomas III
32,220
80,000
Tierra Verde
8,400
115,000
Desert Ridge
58,519
100,000
Total
631,429
1,185,000
*398 Petitioners offered a certified public accountant (C.P.A.) as their expert to "value" the development realty. He used the discounted future cash-flow method to value the development property. His analysis began with estimates provided by the McCormick family of future sales and selling prices of the development property, from which the expected receipts were calculated. It was assumed that all sales would be on the installment basis with 10 percent down, and a 5- and 10-year payout at 11-percent interest for commercial and residential sales, respectively. The McCormicks' estimated future development costs were also used along with a 29-percent estimate of commissions and selling expenses and 2-percent carrying costs. Using this information, the present value of the future cash-flow was calculated using a 20-percent discount rate. Petitioners' expert used only his expertise or judgment to formulate the 20-percent discount rate; all other information that resulted in the value proposed by petitioners was supplied by the partnership's management (the McCormick family). Accordingly, other than his judgment concerning the discount rate, his analysis was mostly computational and based *399 on estimates provided by John McCormick III. Respondent's expert was a qualified real estate appraiser. Respondent's expert used the subdivision development method to value the development real property. That method is used when the realty is "ripe" for development. Anticipated gross proceeds are reduced by development costs, including developer's unrealized profit, overhead, engineering costs, and the expense of rezoning the property. Respondent's expert explained that the comparative sales method would be preferred where available, but that the subdivision development method could also be used to determine value. Respondent's method considered the developer's markup for profit. An absorption analysis was conducted to determine the potential for lot sales. That involves the analysis of the demographics, including trends and land available to determine the timing of land sales. It resulted in the conclusion that Bullhead City's remaining development supply was about 12 to 15 years. From those generalities, a 1.1-percent-per-month absorption rate was determined for the period under consideration. These estimates were based on the actual annual performance in the Bullhead City market. *400 Respondent's expert also relied on comparable retail sales of lots for residential and commercial uses in and near the subdivision under consideration and made adjustments to take into account the lot's size, location, etc. Respondent then factored in an 18-percent discount rate, 15-percent developer's profit, 10-percent marketing expense, 10-percent appreciation rate, and 4-percent growth rate for expenses, to arrive at value. In addition, respondent assumed that, with respect to the joint venture property, the partnership received 90 percent of the receipts; thus, an additional 10-percent reduction was made for the joint venturer's share. Again, a major factor causing the difference in the parties' values is attributable to petitioners' downward adjustments to account for sales on the installment basis, whereas respondent's experts valued the realty based on the standard fair market value approach, assuming a cash sale. As discussed supra p. 21, petitioners have not provided an adequate foundation for the distinction they make. Also, petitioners' value, as was the case of the undeveloped realty, was based on estimates without sufficient supporting data to determine its correctness, *401 whereas respondent's analysis was well documented and utilized an accepted method of valuation employed by a qualified expert. We hold that, as of September 17, 1987, the fair market values for MP's development properties were: Clearwater Hills 4011B -- $ 440,000; Desert Glen -- $ 90,000; Sun Valley parcels -- $ 360,000; Rio Lomas III -- $ 80,000; Tierra Verde -- $ 115,000; and Desert Ridge -- $ 100,000. The parties have proposed total values for MP's development property as of May 1, 1986, generally by taking the estimated values for September 17, 1987, and reducing them by the real property appreciation rate during the period. Petitioners' proposed adjusted total value for MP's development realty is $ 509,766, and respondent's proposed adjusted value is $ 1,016,730. For the reasons expressed above regarding respondent's valuation for September 17, 1987, we find that the total value of MP's development real property as of May 1, 1986, was $ 1,016,730. II. MP2 -- Value of Disputed Underlying Assets
A. MP2 -- Contract and Joint Venture Receivables
The parties valued the contract receivables of MP2 as of September 17, 1987, as follows: Petitioners, $ 8,120,000; respondent, *402 $ 8,672,639. The parties used the same methods and percentages to value MP2's contract receivables as had been used to value MP's contract receivables for the September 17, 1987, valuation date. For reasons expressed in the portion of this opinion concerning MP's contract receivables, we find both methods to be reasonable approaches to valuation, and, accordingly, find that the fair market value of MP2's contract receivables as of September 17, 1987, was $ 8,396,320. B. MP2 -- Undeveloped Real Estate
The parties used the same methodology for valuing undeveloped real property of MP2 as had been used for MP. In particular, John McCormick III, who is not a qualified real estate appraiser, estimated values for petitioners based on his knowledge and experience, while respondent's expert real estate appraiser used comparable sales and adjustments to arrive at a proposed value. Sun Ridge Estates 4042E and 4042F. Parcel 4042E (75 acres) was valued at $ 360,000 by petitioners and $ 490,000 by respondent as of September 17, 1987. Parcel 4042F (46 acres) was valued at $ 82,800 by petitioners and $ 320,000 by respondent as of that date. Respondent's expert viewed this property after *403 it had been graded and did not properly account for the topography of these lots in reaching their value. Respondent's expert described the Sun Ridge Estates 4042E and 4042F parcels as rolling land, when, at the valuation date, they were actually precipitous terrain in need of cutting and filling to prepare the grade for building lots. The values of the Sun Ridge Estates 4042E and 4042F parcels as of September 17, 1987, were $ 425,000 and $ 201,400, respectively. C. MP2 -- Development Real Estate
MP2's development real estate was owned in a joint venture with L&C. The parties estimated the September 17, 1987, value of MP2's development real property as follows: Property
Petitioners'
Respondent's
Description Value Value 4042A
$ 915,430 $ 730,000 4042 block 13
588,310 1,020,000 4042 block 11
[1]    360,000 4042B
127,350 220,000 4042C
1,633,270 3,670,000 4042D
941,550 740,000 Subtotal
4,205,910 6,740,000 Sewer & drainage costs
(997,010)
(830,000)
Total
[2] 3,208,900 5,910,000 As with MP's development property, petitioners used *404 a C.P.A., who, in turn, used the McCormicks' estimates of value and other factors. Using a 20-percent discount rate, petitioners' expert computed the value of MP2's development property by means of discounted future cash-flow analysis. Respondent's expert appraisal witness used the subdivision development method, coupled with comparables and an 18-percent discount rate, to value MP2's development property. The same differences concerning the sales price (cash vs. installment basis) have, for the most part, caused respondent to propose higher values than petitioners did. Another reason for the differing values lies in petitioners' position that the development costs should be subtracted as incurred, whereas, respondent's expert allocates those costs to the remaining lots. We cannot agree with petitioners' position on those points. Petitioners correctly point out that respondent's expert valued blocks 11 and 13 as undeveloped or raw land, when those blocks should have been considered as development land and reviewed under the development methodology. As raw land, those two blocks were valued by respondent's expert at a collective value of $ 1,380,000, whereas the subdivision development *405 method would have resulted in a value of about $ 911,000. In all other respects, the parties' valuation process is the same as used for MP. Accordingly, we find the following values for MP2's development real estate on September 17, 1987: Property
Description Value 4042A
$ 730,000 4042 blocks 11 & 13
911,000 4042B
220,000 4042C
3,670,000 4042D
740,000 Subtotal
6,271,000 Sewer & drainage costs
(830,000)
Total
5,441,000 III. MP2 -- Value of Underlying Assets as of Dec. 1, 1988
The parties' valuation disagreements for MP2 on the December 1, 1988, valuation date concern the same three aspects: Contract receivables, undeveloped real estate, and development real estate. A. MP2 -- Contract Receivables as of Dec. 1, 1988
The parties' values for MP2's contract receivables are $ 12,970,000 (petitioners) and $ 12,683,508 (respondent). The parties used the same approach, and it follows that our reasoning and analysis remain equally applicable. Accordingly, we find MP2's contract receivables, as of December 1, 1988, to have had a value of $ 12,826,754. B. MP2 -- Development and Undeveloped Realty Dec. 1, 1988
Petitioners used the same methodology *406 described above to arrive at a December 1, 1988, value of $ 144,900 for undeveloped and $ 3,730,000 for development realty. Respondent, on the other hand, took the proposed values as of September 17, 1987 ($ 6,720,000), and extrapolated to December 1, 1988, using a 10-percent rate of appreciation to arrive at a composite value of $ 7,500,000 for development and undeveloped realty. We agree with respondent's interpolation and with the 10-percent appreciation rate, especially because it is conservative and does not consider intervening development or improvements to the undeveloped realty. Accordingly, with respect to parcel 4042F, we find a December 1, 1988, value of $ 203,757. Regarding the development realty, however, respondent's expert's approach does not account for property sold or acquired between September 17, 1987, and December 1, 1988, a period of more than 1 year. On the other hand, we do not fully approve of petitioners' approach, which contains inappropriate reductions for their fair market value analysis. Accordingly, neither approach is wholly acceptable. Under these circumstances, and taking into account our concerns with each party's methodology, we find that the *407 total fair market value of MP2's development real estate, as of December 1, 1988, was $ 4,578,315. IV. Discounts Applicable
Having placed a value on the underlying assets of each partnership, adjustments must be made to reflect the equity interest in the joint venture between MP2 and L&C, and then to each partnership interest to adjust for minority and marketability discounts. Additionally, the parties differ in their approach to the size of the interest in connection with the gifts. Petitioners have valued each separate .5- or .75-percent gift individually, and respondent has valued the aggregate of all .5- or .75-percent gifts given to McCormick family members on a particular date. The parties believe that these questions should affect the size of the discounts used. We consider each of these aspects separately. In order to value MP2, it would be necessary to determine its interest in the L&C joint venture. Preference allocations were to be made to MP2 based on a prescribed formula. The parties have stipulated information which will provide them with the result of the preferred allocations in order to determine the total value of MP2's interest in the joint venture for purposes *408 of valuing a specific interest in MP2. That matter is accordingly left to the parties' Rule 155 computation. The shares of a corporation that represent a minority interest are usually subject to a minority discount. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc); Ward v. Commissioner, 87 T.C. 78, 106 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 953 (1982). The minority discount is recognized because the minority shareholder lacks the general ability to cause the payment of dividends, compel liquidation, or control corporate policy. Ward v. Commissioner, supra; Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). Respondent contends that the minority discount for a general partnership would be less than a minority interest in a similar corporation. The basic premise for respondent's contention is that, under North Dakota law, a small percentage general partner could cause the dissolution of the partnership, *409 and, thus, have access to some form of liquidation value based on his percentage interest. In particular, respondent references N.D. Cent. Code secs. 45-09-01 and 45-09-03 (1993). N.D. Cent. Code sec. 45-09-01 generally defines dissolution, and N.D. Cent. Code 45-09-03, subsection 1.b., permits dissolution for the following cause: "By the express will of any partner when no definite term or particular undertaking is specified." Respondent points out that the partnership agreements for MP and MP2 do not specify when or why a partner may cause dissolution. Petitioners do not contest respondent's contention that a partner may have the ability to cause dissolution, but they do contend that dissolution would not necessarily result in partition of the realty or the immediate receipt of partnership property in kind. Instead, petitioners argue that the dissolution procedure merely causes the partnership to go into a "winding-up mode" which would not enhance the value of a general partner's minority interest. The parties both reference the North Dakota statutes and Lonning v. Kurtz, 291 N.W.2d 438 (N.D. 1980). In that case, the North Dakota Supreme Court considered *410 three questions which are relevant to our inquiry here. It considered the North Dakota statutory law concerning partnership dissolution, the effect of a partnership agreement on that law, and whether and how a departing partner is paid for a partnership interest. In the Lonning case, which also involved a general partnership engaged in real estate development, one of three partners was considered expelled from the partnership. The expelled partner wished a settlement of his partnership interest in accord with the partnership agreement providing that dissolution would not occur upon expulsion of a partner and that a partner who leaves due to expulsion must offer to sell his partnership interest to the remaining partners. If no price could be agreed upon, there were provisions for appraisals of the partnership's real property to settle the question of value. After a discussion of the Lonning partnership's expulsion provision, the Court explained: Even if the partnership agreement had not provided for dissolution upon expulsion or voluntary withdrawal, any partner could have dissolved the partnership at any time. No one can be forced to continue a partnership against *411 his will. * * * The partners, by their agreement, may provide that the partnership will continue for a definite time or particular undertaking, but this does not limit a partner's power -- only his right -- to dissolve, in which case the dissolving partner may be liable for breach of contract. * * * [Id. at 440-441; citations omitted.]
The MP and MP2 partnership agreements provided for the buyout of a deceased partner's interest, and that no interest could be transferred without consent of the partnership. The partnership agreements, however, had no provisions concerning dissolution or arrangements for valuing or paying for the interest of a partner who voluntarily or involuntarily withdrew from the partnership. Accordingly, unlike a corporate minority shareholder, a North Dakota general partner may be in a position to obtain the value of his capital contribution and any accumulated profits to which he may be entitled. That difference is relevant in considering the amount of discount to be applied for a minority interest. This would be especially so if the precedent relied on to set the percentage were derived from cases involving shareholders rather *412 than partners. Petitioners argue that, as a practical matter, dissolution, winding up, and liquidation of the assets of the MP and MP2 partnerships would be a lengthy process because of the nature of the businesses and the underlying assets. As a result, to the extent that any difference exists between a partner's and a shareholder's ability to obtain the net value of his interest, petitioners argue that it would have relatively little effect on the minority discount to be used in this case. We tend to agree with petitioners on this point because liquidation value in the setting of this case would not be readily available to the holder of a small percentage of these family partnerships. In that connection, it is less likely that a willing buyer would purchase any of the interests under consideration for the purpose of liquidating the underlying assets. It is more likely that a willing buyer would seek to invest in what appears to be a profit-making and ongoing business. The availability of assets in the event of a dissolution and/or liquidation, however, may indicate less overall risk, and support a higher value for an entity. Accordingly, we will take into consideration the differences *413 between North Dakota partners and shareholders to the extent we rely on case precedent involving minority interests in corporations. Next, the parties differ on the question of whether, for discount and valuation purposes, the gifts should be considered in the aggregate or individually. For example, petitioner, on May 1, 1986, made gifts to 23 donees of interests in MP, ranging from .5 percent to 3.175 percent, and totaling 30.225 percent. Respondent's expert applied a minority discount of 10 percent, considering a 30.225-percent interest. Petitioners' expert, on the other hand, used a 30-percent minority discount for each interest, irrespective of whether it was at the smaller (.5 percent) or larger (3.175 percent) end of the range of gifts. Respondent has not referenced any authority on point, or a rational basis for valuing separate gifts to different individuals in the aggregate. Respondent, by way of analogy, cites estate tax cases which hold that the value of property on the date of death is the value of the whole and not the value that divisible property may have when parts of it may come to rest in the hands of beneficiaries of an estate. Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); *414 Ahmanson Found. v. United States, 674 F.2d 761, 768 (9th Cir. 1981). We are unpersuaded that those holdings would be applicable for gift tax purposes. See also Phipps v. Commissioner, 43 B.T.A. 1010, 1022 (1941), affd. 127 F.2d 214 (10th Cir. 1942); Whittemore v. Fitzpatrick, 127 F. Supp. 710, 713-714 (D. Conn. 1954). Although all donees received property from the same donor(s), and even though all donees belong to the same family, respondent has shown no persuasive reason for valuing the gifts in the aggregate. To the extent that we can discern that the discounts applied by respondent's expert were influenced by the aggregation of interests given on the same date, the probative value of the expert's opinion will be lessened. Petitioners also argue that we must take into consideration whether the net asset values of MP and MP2 should be reduced by the estimated amount of tax which no longer could be deferred for installment basis sales due to the Tax Reform Act of 1986. It must first be emphasized that the valuation process, by use of a willing buyer and seller, *415 assumes that all market factors may affect the price or value of an asset. Certainly, willing buyers consider the tax impact upon their business purchases. But these factors are part of the causes and effects which fashion the price we call "fair market value". If petitioners argue that additional discounts should be taken in the valuation process because the tax consequences of the 1986 Act are less favorable for MP or MP2 than for comparable companies, they have not adequately explained that phenomenon or shown that to be so in these cases. [8]
*416 The percentage minority and marketability discounts used by petitioners' and respondent's experts for the valuation dates were as follows: Petitioners
Respondent Minority
Marketability
Minority
Marketability
Discount
Discount Discount
Discount Date
Entity
(%) (%)
(%) (%)
5/1/86
MP
30
30
10
12
9/17/87
MP [1]
30
30
15
15
9/17/87
MP2
35
30
20
18
12/1/88
MP2
40
30
25
15
We first consider the parties' methodology and approach to minority discounts. Petitioners' minority discounts range from 30 to 40 percent, and respondent's range from 10 to 25 percent. Petitioners' expert, in valuing the September 17, 1987, 14.78-percent interest in MP, used publicly held real estate investment companies as comparable [9] *418 or "guideline" companies to measure the investment price as a percentage of the net asset value. After arriving at a composite based on this analysis, comparisons were made with MP's attributes in order to decide whether the composite should be adjusted *417 up or down to arrive at the applicable discount. Publicly held companies were used for comparison because their underlying financial data is available for analysis, and the stock prices are better established through regular trading, unlike unlisted securities. To be comparable, the data base was limited to publicly held real estate companies that reported the fair market value as opposed to the book value of the underlying real estate holdings. Thirteen companies were selected, and, on a fair market value basis, the net asset value per share was determined. The trading price per share was then compared with the net asset value, resulting in a percentage relationship of a minority market interest (single share). The percentages ranged from a low of 51.9 percent to a high of 110.5 percent. The median ratio used was 85.5 percent, indicating a 14.5-percent discount. [10] Financial leverage was measured by determining the percentage of total liabilities to the market value of assets. The median ratio was 35 percent. Next, MP's financial condition was compared to those of the selected companies. Petitioners' expert then determined the same ratio for MP based on petitioners' proposed fair market values and after reduction for the estimated tax burden on sales. On that basis, MP's leverage ratio was 57 percent without considering a joint loan with MP2. If the joint loan were considered, MP2's leverage ratio, according to petitioners' expert, would have been 116 percent. The percentage of net assets to total assets was also determined for the comparables and for MP. Using petitioners' values, the expert concluded that MP's ratio was less favorable than those of the comparables. Based on these computations, it was concluded that MP's financial position was weaker than those of the comparables. The comparable median 14.5-percent discount was further adjusted (increased) by petitioners' expert to account for *419 the following additional factors in which it was concluded that MP was inferior to the comparables: (1) MP was less diversified -- selling in only one area; (2) MP was relatively highly collateralized; (3) MP sold on the installment basis requiring payment of tax on the front-end of the sales; [11] (4) MP was considered an entity of finite life, and it was concluded that it would sell at a lower price. After consideration of all those factors, and without assigning a particular value to any, petitioners' expert arrived at a valuation ratio of 70 percent (i.e., MP would sell at about 70 percent of net asset or fair market value), which equates to a 30-percent discount. The same analysis was performed for MP2 on two different valuation dates, and petitioners' expert concluded that minority discounts of 35 *420 and 40 percent would be appropriate. MP2's discounts were higher because its ratios were less favorable than MP's when compared with those of the guideline companies. Respondent's expert used substantially similar methodology to reach a proposed minority discount. Respondent's comparables consisted solely of Real Estate Investment Trusts (REIT), whereas petitioners' consisted of REIT's and corporations engaged in similar real estate pursuits. There were several matches between the parties' comparables. Respondent's expert conducted a similar analysis of the comparables. Respondent's expert pointed out that studies have been done for the period under consideration which reflect average discounts for minority interests and premiums for majority interests. Respondent contends that the average discount for all surveyed companies is greater than the discount for real estate companies because the risk is lessened by the real estate assets' liquidation values which secure the investment in a worst case scenario. Respondent's expert, after analysis, concluded that the comparable real estate companies had minority discount rates ranging from 13.23 to 28.5 percent, with most falling in the *421 range of 11.0 to 17.69 percent. Finally, a 17-percent average rate for minority discount was determined for the comparables. From the 17-percent average, respondent's expert made adjustments to arrive at minority discounts for each valuation situation. MP was found to have an equity-to-assets ratio of 65.78 percent, which compared to the average for the REIT of 69.29 percent. In addition, MP was found to have 81.39 percent of its equity in loans and contracts, which placed MP just below the guideline companies' average. According to respondent's expert, the most significant factors that influence the size of the minority discount are the size of the interest being appraised and the concentration of ownership in the remaining interests. Further, the quality and risk factors of the underlying real estate and receivables may influence the discount rate. Respondent concluded that the 14.78-percent interest in MP was advantaged because the remaining interests in MP were fragmented amongst 25 individuals. In that regard, petitioner held a 21.275-percent interest, and the remaining interests were held by 25 individuals, the largest of which was a 9.23-percent interest. Under respondent's *422 approach, the 14.78-percent interest being valued would be subject to a 17-percent minority discount. In a like manner, respondent formulated the minority discounts for each of the other interests. With respect to the smaller interests gifted on May 1, 1986, and December 1, 1988, respondent aggregated the gifts to arrive at the interest to be discounted. Respondent's aggregation approach, however, is flawed. We note that respondent and petitioners arrived at relatively similar discounts of 17 percent (respondent) and 14.5 percent (petitioners), derived from analyzing and averaging comparables. From that base, the parties proceeded to use differing approaches, as described above. After considering each aspect, we hold the following minority discounts to be applicable, which are shown along with petitioners' and respondent's proposed discounts for purposes of comparison: Petitioners'
Respondent's
Minority
Minority
Court's Discount
Discount
Holding Date
Entity
(%) (%) (%) 5/1/86
MP
30
10
24
9/17/87
MP
30
15
18
9/17/87
MP2
35
20
23
12/1/88
MP2
40
25
32
Marketability discounts may apply in addition to a minority or lack of control *423 discount where the interest under consideration is illiquid. Harwood v. Commissioner, 82 T.C. at 268; Estate of Andrews v. Commissioner, 79 T.C. at 953. Petitioners' expert conducted a study of occasional private sales of unregistered shares of public corporations in order to develop a guideline for a marketability discount for interests in MP and MP2. A series of over-the-counter transactions was listed with focus on the market price as opposed to the private sale of a fractional interest. The median difference from market to private sale price was 27.6 percent. No relationship could be correlated between the size of the block and the resulting discount. Because the partnerships here are closely held, and considering the "investment quality", petitioners' expert concluded that the marketability discount for any of the interests under consideration should be 30 percent. Respondent's expert looked to studies of restricted sales of publicly held corporate stock. The study relied on companies categorized by their earnings. MP and MP2 fit within categories where the marketability discounts ranged from 10 to 20 percent. With *424 respect to MP and MP2, respondent's expert then conducted an analysis of three additional factors with respect to marketability. The three factors considered were: The extent or relative size of the interest, the risks inherent in the business conducted by the entity, and restrictions on transferability of the interest. For example, with respect to the 14.78-percent interest in MP, its relative size to the remaining interests called for a smaller discount. The location of the land in a small geographical area required increases in the discount. Finally, the requirement that a deceased partner's interest be offered to the partnership was a limitation on transferability that increased the discount. Taking those factors into consideration, respondent's expert opined that the marketability discount to be applied in reaching the fair market value of the 14.78-percent MP interest should be 15 percent. In a similar manner, respondent's expert developed marketability discounts for each partnership interest. Petitioners' approach does not account for specific aspects of marketability, whereas respondent's expert attempted to consider traditional marketability factors. Respondent relied *425 on third party studies for her 10- to 20-percent base. We are unable to analyze the specifics of respondent's base. Petitioners developed a 27-percent base by analyzing over-the-counter stock sales. Petitioners' approach, although providing more detail, has not been effectively reconciled to the particular partnership attributes under consideration. Having considered each aspect, we hold the following marketability discounts to be applicable, which are shown along with petitioners' and respondent's proposed discounts for purposes of comparison: Petitioners'
Respondent's
Marketability
Marketability
Court's Discount
Discount
Holding Date
Entity
(%) (%) (%) 5/1/86
MP
30
12
22
9/17/87
MP
30
15
20
9/17/87
MP2
30
18
21
12/1/88
MP2
30
15
22
To provide for agreements of the parties and to reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for purposes of trial, briefing, and opinion: Estate of Lucile Marie McCormick, Deceased, John L. McCormick, Personal Representative, docket No. 18418-91; and J.L. McCormick, docket No. 18422-91.↩
2. The parties' stipulation of facts and exhibits are incorporated in this opinion by this reference.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, or (in the case of gift tax provisions) as of the date of the gift, and all Rule references are to this Court's Rules of Practice and Procedure.↩
1. These amounts have been rounded to the nearest dollar.↩
1. The parties have agreed that the underlying values reached for MP's Sept. 17, 1987, estate tax valuation will also be used for the July 1, 1987, gift tax valuation.↩
1. The parties have agreed that the Needles property should be valued at $ 43,163 for all valuation dates in controversy.↩
4. Petitioners reflected this property as 215 acres and respondent as 220. We have used 215 acres as the correct amount for purposes of this case.↩
5. Respondent valued the Rio Lomas II 80-acre parcel with the 36-acre Northeast Highlands parcel, whereas petitioners valued the two parcels separately. For purposes of consistency, we have treated the parcels separately and adjusted respondent's value proportionately.↩
6. Petitioners reflected this property as 27.08 acres and respondent as 22.97 acres. We have used 27.08 acres as the correct amount for purposes of this case.↩
7. Petitioners reflected this property as 26 acres and respondent as 31.47 acres. We have used 26 acres as the correct amount for purposes of this case.↩
1. Respondent valued the three Sun Valley parcels as a single unit.↩
1. Petitioners valued blocks 11 and 13 together.↩
2. Petitioners rounded total to $ 3,210,000.↩
8. Petitioners cited Obermer v. United States, 238 F. Supp. 29 (D. Haw. 1964); Gallun v. Commissioner, T.C. Memo. 1974-284; and Estate of Cruikshank v. Commissioner, 9 T.C. 162↩ (1947), in connection with the argument that a separate reduction or discount should be applied to cover tax burden or lack of tax deferral. We do not understand those cases to stand for a general legal principle requiring or even suggesting a separate discount or consideration of tax effect to the "willing buyer". As we understand those cases, they stand for the principle that a willing buyer would consider the tax effects, among other things, in the process of price formulation.
1. By agreement of the parties, the July 1, 1987, gifts of MP interests are to be valued based on the outcome of the Sept. 17, 1987, valuation of decedent's interest in MP.↩
9. Petitioners' expert used the term "guideline" companies, but used them for comparison and to reach a conclusion as to the amount of minority discount. We use the term "comparable(s)" in our discussion to mean that the entities are being compared, but not necessarily that they are comparable.↩
10. Petitioners' expert assumped that companies with plans to liquidate at a specified time would sell at a price closer to the value of net assets due to the anticipated receipt or liquidation of the assets.↩
11. The fact that taxes are front loaded on sales transactions makes a company possibly more attractive with respect to already reported sales (receivables), and possibly less attractive with respect to future sales.↩